**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-469 |
| *Plaintiff - Appellee,* | D.C. No. 2:21-cr-075-RSL |
| v. | |
| JOHN HOLCOMB, | OPINION |
| *Defendant - Appellant.* | |

Appeal from the United States District Court
for the Western District of Washington
Robert L. Lasnik, District Judge

Argued and Submitted September 10, 2024
Seattle, Washington
Opinion Filed March 27, 2025
Opinion Withdrawn September 11, 2025

Filed July 17, 2026

Before: Susan P. Graber and Jennifer Sung, Circuit Judges,
and Jed S. Rakoff, District Judge.[*]

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

Per Curiam Opinion;
Dissent by Judge Sung

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's ruling on John Holcomb's motion to suppress three videos found on his computer, vacated his conviction and sentence for producing child pornography, and remanded for further proceedings.

Denying Holcomb's motion to suppress, the district court held that a second search warrant's dominion and control provision was overbroad and insufficiently particular, but that the good-faith exception applied.

The panel held:

- When a magistrate issued the second warrant, which authorized officers to search Holcomb's computer for evidence of the crime of rape in the second degree, probable cause existed.

- The warrant was overbroad and insufficiently particular because the warrant's dominion and control provision lacked any temporal limitation.

- Although the initial search may have proceeded in good faith, probable cause dissipated, as did any good faith, when the officers discovered the video of

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the alleged rape, showing them that the alleged crime described in the warrant almost certainly had not occurred. Under binding and longstanding precedent, no reasonable officer would continue searching after probable cause dissipated, and no reasonable officer could have concluded that probable cause existed after watching the video.

- The disputed evidence was not in plain view.

- Suppression is the appropriate remedy for the Fourth Amendment violation here because the deterrent effect is significant and outweighs the social cost.

Judge Sung dissented. She wrote: (1) no precedent required the police to stop executing the warrant and report to the magistrate when they found the first video; (2) faithfully applying the line of cases on which the majority relies, the police did not violate the Fourth Amendment by continuing their search; (3) even if the police violated a duty to report to the magistrate, suppression is unwarranted because probable cause did not completely dissipate; (4) because the majority concludes that the police unreasonably executed the warrant, they erred in considering the applicability of the good-faith exception for reasonable reliance on a later-invalidated warrant; and (5) remand is necessary to determine whether the dominion and control provision justifies suppression.

## COUNSEL

Matthew P. Hampton (argued), Jehiel I. Baer, and Jonas B. Lerman, Assistant United States Attorneys; Laura Harmon, Special Assistant United States Attorney, Criminal Division; Teal L. Miller, Acting United States Attorney; Tessa M. Gorman, United States Attorney; Office of the United States Attorney, United States Department of Justice, Seattle, Washington; for Plaintiff-Appellee.

Colin A. Fieman (argued) and Gregory Geist, Assistant Federal Public Defenders; Alan Zarky, Research and Writing Attorney; Office of the Federal Public Defender, Seattle, Washington; for Defendant-Appellant.

John C. Ellis Jr., Law Offices of John C. Ellis Jr. Inc., San Diego, California, for Amici Curiae Digital Forensic Examiners.

Jennifer S. Granick, American Civil Liberties Union Foundation, San Francisco, California; Brett M. Kaufman, American Civil Liberties Union Foundation, New York, New York; Jazmyn Clark, American Civil Liberties Union of Washington Foundation, Seattle, Washington; for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Washington Foundation.

David B. Owens and Rachel Nowlin-Sohl, Attorneys; Averill L. Aubrey, Megan Haygood, Kayleigh McNiel, and Michael C. Orehek, Law Students; Civil Rights and Justice Clinic University of Washington School of Law, Seattle, Washington; for Amici Curiae Fourth Amendment Scholars.

# OPINION

PER CURIAM:

This case raises the familiar, but always troubling, question whether someone can be prosecuted for despicable criminal conduct using evidence obtained in violation of the Fourth Amendment. Here, officers conducting a search of Defendant John Holcomb's computer, pursuant to a warrant, continued to search even after they learned that probable cause had ceased to exist, and they found damning evidence of a different crime only after probable cause had dissipated. In the circumstances, respect for the Constitution and the rule of law requires suppression of the evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early hours of January 28, 2020, Holcomb called 911 from his house, and officers of the Burlington Police Department responded. When they arrived at Holcomb's house, he said that he had recently rescued his ex-girlfriend, "JJ," from sex slavery and that he had brought her to his house. Holcomb told officers that JJ was "acting crazy" and that he wanted her to leave.

Officers then spoke with JJ, who claimed that Holcomb had forced her to have sex with him. She stated that she and Holcomb had engaged in sexual relations the evening before, in his bedroom, during which Holcomb took photographs of her on his cellphone without her consent. She also reported that Holcomb uploaded the photographs onto his computer. Later that evening, JJ stated, she agreed to perform oral sex on Holcomb in his bedroom. But she alleged that, when she told Holcomb that she wanted to stop, he pushed her head down and forcibly inserted his finger into her anus, causing

her significant pain.  JJ further claimed that, after being restrained by Holcomb against her will, she had finally managed to break free, had said "I'm done," and had left the bedroom crying.

Officers immediately investigated the alleged rape.  That same day, they obtained a search warrant (the "first warrant") for Holcomb's house that authorized them to seize, but not search, his cellphone and computer.  When officers executed the first warrant, they noticed that monitors connected to Holcomb's computer displayed images from a surveillance system, which included a video camera in his bedroom.  Later that evening, officers returned to Holcomb's house and arrested him for rape.

Holcomb insisted that the sexual encounter was consensual and that a surveillance video on his computer would prove his innocence.  Holcomb's then-girlfriend, who was at the house when Holcomb was arrested, confirmed Holcomb's account.  She explained that she had watched the video on Holcomb's computer before the police seized it and that it showed that his encounter with JJ was consensual. Holcomb consented to a search of his computer, provided officers with his computer password, and told them how to find and play the video.  But six days later, before officers had viewed the video, Holcomb informed them that he wished to withdraw his consent to search his computer.

The next day, the state sought, and the Skagit County Superior Court granted, a warrant (the "second warrant") to search Holcomb's computer.  That warrant authorized the

government to "search for and seize" five categories of evidence of the crime of rape in the second degree:

> (1) Evidence of communications to or from JJ and/or between JOHN HOLCOMB. . . . This communication includes but is not limited to voicemails/audio recordings, SMS, MMS, emails, chats, social media posts/online forums, contact lists and call logs from June 1, 2019 to current.

> (2) Surveillance video or images depicting JJ or JOHN HOLCOMB and any other surveillance video or images from Jan[uary] 26th 2020 to current.

> (3) Any location data including GPS coordinates from Jan[uary] 26th 2020 to current.

> (4) User search history from the devices to include but not limited to searched words, items, phrases, names, places, or images from Jan[uary] 26[th] 2020 to current.

> (5) Files[,] artifacts or information including but not limited to[] documents, photographs, videos, e-mails, social media posts, chats and internet cache that would show dominion and control for the devices.

Although the first four provisions of the second warrant were limited to the time period surrounding the alleged rape in

2020,[1] the fifth provision, which concerned "dominion and control" of Holcomb's devices, did not contain any temporal limitation.

After the court issued the second warrant, Detective Duane Neufeld, a digital forensic examiner, began a search of Holcomb's computer. The computer contained thousands of files stored across separate "upper" and "lower" hard drives. The upper and lower hard drives contained files created during different time periods. The upper hard drive contained newer files, including files from June 1, 2019, forward and including surveillance footage from the camera in Holcomb's bedroom from January 2020. The lower hard drive contained older files, all of which were created before September 2018. Rather than use an available computer program that would have allowed him to filter the computer's files by date and time, or otherwise to limit his search to the period surrounding the alleged rape, Detective Neufeld "pull[ed] up all [the] videos" and "start[ed] just scrolling through [them]."

He soon found a video of Holcomb and JJ from January 27, 2020, in the computer's upper hard drive. That video depicted two sexual encounters: one during which Holcomb took photographs of JJ on his cellphone and another during which JJ performed oral sex on Holcomb. At no point did Holcomb appear to restrain JJ or otherwise to compel JJ forcibly to engage in sexual intercourse. Detective Neufeld showed the video to his supervisor, Detective Adrian Kuschnereit, and a prosecutor. After viewing the video,

---

[1] Unlike the second, third, and fourth provisions, the first provision covered evidence from "June 1, 2019 to current" in order to account for a period during which Holcomb and JJ exchanged messages to plan their January 2020 meeting.

which was made on the date of the alleged rape and which matched JJ's description in all particulars except for the allegations of forcible compulsion, Detective Kuschnereit directed the Washington State Patrol Crime Laboratory to "stop all testing except for the required testing" because he expected that the case would be dismissed soon.

Notwithstanding that expectation, Detective Neufeld resumed his search of the computer. During this second search, which was directed toward the lower hard drive, he viewed various videos that were dated several years before the alleged rape occurred. He discovered three videos that appeared to depict child sexual abuse. As he later explained, he first noticed a thumbnail for a video from November 2016 that "appeared similar" to the video of Holcomb and JJ having sex from January 2020. He opened that video, which showed Holcomb raping a pre-pubescent girl, whom officers later identified as Holcomb's daughter. Detective Neufeld also observed, but did not open, two additional videos from November 2016 with thumbnails that appeared to depict pre-pubescent girls who were "posed for sex."

Following Detective Neufeld's observations, the Burlington Police Department obtained a third warrant, this time to search Holcomb's computer for child pornography. That warrant authorized the Burlington Police Department to open and view all three videos. After reviewing the three videos, the Burlington Police Department dropped the charge against Holcomb involving JJ, but the Island County Police Department charged him with rape of a child and related crimes. Holcomb moved to suppress the three videos. Without responding to that motion, the Island County Police Department dropped the charges against Holcomb. The Skagit County Police Department then brought similar charges. When Holcomb again moved to

suppress the videos, the Skagit County Police Department similarly dropped its charges. Local authorities then referred the case to the FBI.

Thereafter, a federal grand jury indicted Holcomb on one count of producing child pornography in violation of 18 U.S.C. § 2251(a). Once again, Holcomb moved to suppress the three videos.

The district court initially granted Holcomb's motion to suppress.[2] The court determined that probable cause supported the second warrant but that the dominion and control provision was both overbroad and insufficiently particular because it lacked any temporal limitation. The court concluded that the good-faith exception did not apply because "the dominion and control clause of the warrant was so facially deficient that no executing officer could reasonably presume it to be valid."

The government moved for reconsideration. The district court reaffirmed its earlier holding that the dominion and control provision was overbroad and insufficiently particular. But the court now agreed with the government with respect to the good-faith exception. The court was unaware of any case specifically holding that dominion and

---

[2] It is undisputed that the second warrant issued by a state judge is, pursuant to the Fourteenth Amendment, subject to the limitations on searches and warrants set by the federal Constitution. See Stonehill v. United States, 405 F.2d 738, 743 (9th Cir. 1968) (discussing Mapp v. Ohio, 367 U.S. 643 (1961), and Elkins v. United States, 364 U.S. 206 (1960)). Moreover, the federal government used the fruits of the second warrant to bring the federal prosecution of Holcomb, so the Fourth Amendment also comes into play directly. See, e.g., United States v. Jobe, 933 F.3d 1074, 1076–78 (9th Cir. 2019); United States v. Bynum, 362 F.3d 574, 578–79 (9th Cir. 2004); United States v. Washington, 797 F.2d 1461, 1467–71 (9th Cir. 1986).

control provisions must be temporally limited, so the court held that the good-faith exception applied. Accordingly, the district court granted reconsideration and denied Holcomb's motion to suppress.

Holcomb then pleaded guilty to producing child pornography pursuant to a plea agreement. In the plea agreement, he reserved the right to appeal the district court's order denying his motion to suppress. The district court sentenced Holcomb to a term of 240 months of imprisonment, to be followed by a lifetime of supervised release. This timely appeal followed.

We published an initial opinion reversing the conviction. United States v. Holcomb, 132 F.4th 1118 (9th Cir. 2025). We later withdrew that opinion in response to the government's petition for rehearing. 153 F.4th 965 (9th Cir. 2025) (order).

## STANDARDS OF REVIEW

We review de novo the denial of a motion to suppress evidence. United States v. Holmes, 121 F.4th 727, 734 (9th Cir. 2024). We review for clear error the district court's factual findings, and we review de novo pure questions of law and mixed questions of fact and law. United States v. Estrella, 69 F.4th 958, 964 (9th Cir. 2023).

## DISCUSSION

### A. There Was Probable Cause to Investigate an Alleged Rape.

A warrant must be supported by probable cause. U.S. Const. amend. IV. Probable cause requires a "fair probability," alternatively described as a "substantial chance," that a crime has occurred. Safford Unified Sch.

Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009) (quoting Illinois v. Gates, 462 U.S. 213, 238, 244 n.13 (1983)). The "probable cause" standard demands more than "reasonable suspicion," which requires only a "moderate chance" that a crime has occurred. Id. at 370–71; see also United States v. Sokolow, 490 U.S. 1, 7 (1989) (holding that the "reasonable suspicion" standard is "obviously less demanding than" the "probable cause" standard). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." Maryland v. Pringle, 540 U.S. 366, 371 (2003). The Supreme Court has "stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt and that the belief of guilt must be particularized." Id. (brackets, citations, and internal quotation marks omitted).

Here, Holcomb challenges the second warrant, which authorized the officers to search his computer for evidence of the crime of rape in the second degree. That crime requires sexual intercourse "[b]y forcible compulsion" (or in other circumstances not relevant here). Wash. Rev. Code § 9A.44.050(1)(a). "'Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." Id. § 9A.44.010(3).

When the second warrant was issued, probable cause clearly existed as to the crime of rape in the second degree. Detective Kuschnereit's affidavit in support of probable cause described the following events. On January 27, 2020, Holcomb and JJ arrived at Holcomb's house at around 5:00 p.m. JJ reported to police officers a very specific and

detailed account of what transpired at Holcomb's house. For example, JJ described the furniture and furnishings in the bedroom in detail.

JJ reported that she and Holcomb had sex twice. The first time took place from approximately 8:30 p.m. to 9:20 p.m., included vaginal and anal intercourse, and was consensual.

The second encounter began sometime after 11:00 p.m. JJ gave Holcomb "a blowjob by placing his erect penis into her mouth." JJ described in detail how, placing his hand on her head, Holcomb forced JJ to continue, even though JJ told Holcomb "no" three separate times. Over JJ's explicit objections, Holcomb "kept pushing her head back down" with his hand on her head. At one point, JJ managed to tell Holcomb that she felt sick, and he responded by saying "So?" or something similarly dismissive. Holcomb forced his penis further into her mouth, causing her to experience a pain of "7 on a scale of 1-10." "JJ said that when she tried to pull her head back harder, he pushed harder down on her head. JJ described how as he was doing this he had one hand grabbing her head, and at the same time his other hand reached over and penetrated her anus with one of his fingers." "JJ described [Holcomb]'s finger penetrating her anus as causing her great pain of 8 on a scale of 1-10." "JJ said that due to her pulling away, and also by her verbally telling him several times that it was very clear to him that it was not consensual sex." JJ reported that, "[t]he more I fought, the more determined he was." JJ eventually managed to get free, said "I'm done," and left the room crying. Holcomb and JJ then argued in the living room, and Holcomb called 911. Police records show that officers received the 911 call at 12:39 a.m. on January 28, 2020.

Crediting JJ's account, probable cause clearly existed. Sexual intercourse occurred.  See Wash. Rev. Code § 9A.44.010(14) (defining "sexual intercourse").  And it was by forcible compulsion because Holcomb used his hand, which he placed on her head, physically to force JJ to continue oral sex, even though she told him "no" three times and even though she physically tried to discontinue the act. See id. § 9A.44.010(3) (defining "forcible compulsion"). Probable cause thus existed when the magistrate issued the second warrant.

B. Nonetheless, the Second Warrant Was Overbroad and Insufficiently Particular.

We next consider the validity of the dominion and control provision of the second warrant.  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."  U.S. Const. amend. IV.  Our cases have explained that the Fourth Amendment's specificity requirement has two aspects: breadth and particularity.  As to breadth, a warrant must "be limited by the probable cause on which the warrant is based."  United States v. SDI Future Health Inc., 568 F.3d 684, 702 (9th Cir. 2009).  As to particularity, a warrant must "clearly state what is sought."  Id.  Together, those requirements protect against "the principal evil" of general warrants, which allowed royal officials during the colonial era to "search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown."  Ashcroft v. al-Kidd, 563 U.S. 731, 742–43 (2011); see also United States v. Kahre, 737 F.3d 554, 566 (9th Cir. 2013) (per curiam) ("The prohibition of general warrants imposes a particularity limitation, requiring warrants to specify the items to be

seized and the locations to be searched."). "[G]iven the vast amount of data" stored on computers, a "heightened" specificity requirement applies "in the computer context." United States v. Adjani, 452 F.3d 1140, 1149 (9th Cir. 2006). And "[e]vidence seized pursuant to illegal general warrants must be suppressed." United States v. Espinosa, 827 F.2d 604, 610 (9th Cir. 1987).

Starting with overbreadth, the government has failed to identify any meaningful limitation on the scope of the dominion and control provision. As noted above, the dominion and control provision authorized the state to search for "[f]iles[,] artifacts or information including but not limited to[] documents, photographs, videos, e-mails, social media posts, chats and internet cache that would show dominion and control for the [computer]." Unlike the other provisions of the warrant—which were limited to communications between Holcomb and JJ, surveillance footage, location data, and the computer's search history—the dominion and control provision was not limited to a particular type of evidence. In addition, again unlike the other provisions, the dominion and control provision lacked any temporal limitation, thereby authorizing the state to open and examine any file from any time period, including files that long predated the alleged rape. The government's lawyer conceded as much during oral argument, stating that "almost any file could be opened to determine if it was responsive" to the dominion and control provision. Oral Argument at 25:36–25:39, https://www.ca9.uscourts.gov/media/video/?20240910/23-469/.

Importantly, the affidavit underlying the second warrant set forth no ground to find probable cause to conduct a search—much less a limitless search—for dominion and

control evidence. In fact, apart from the portion of the affidavit that merely restated the dominion and control provision, the affidavit does not mention dominion or control.[3] To the extent that the affidavit alludes to dominion and control at all, it simply recounts how Holcomb initially "provided written permission to search . . . both his desktop and laptop computers," how Holcomb "advised police that he revoked his previous consent to search both his computers," and how the government was "therefore applying for a search warrant in order to search [the] devices." Those statements do not establish probable cause to review all files on Holcomb's computer to determine whether they might bear on the issue of dominion and

---

[3] By contrast, each of the other provisions of the second warrant was tied to allegations in the affidavit. As for the first provision, which concerned communications between Holcomb and JJ in the months leading up to the alleged rape, the affidavit explains that JJ told officers that she had been communicating with Holcomb using various apps and websites for several months, that JJ showed officers some of their messages on her phone, and that officers observed that similar messages were "plainly visible" on Holcomb's open computer when they recovered it pursuant to the first search warrant. As for the second provision, which concerned surveillance footage on the day of the alleged rape and afterwards, the affidavit describes Holcomb's "active surveillance system," which officers discovered while executing the first search warrant. As for the third provision, which concerned location data from the day of the alleged rape and afterwards, the affidavit states that officers already had seized Holcomb's cellphone pursuant to the first search warrant, that people tend to keep their cellphones on their persons, and that cellphones can therefore be used to obtain location data. And finally, as for the fourth provision, which concerns Holcomb's search history on the day of and after the alleged rape, the affidavit stated that officers observed various search results on Holcomb's open computer and that evidence of a defendant's search history "can be used to corroborate or refute the details of [an] . . . alibi or the statements of a victim or witness."

control.  We therefore conclude that the second warrant's dominion and control provision was overbroad.

We similarly conclude that the dominion and control provision was insufficiently particular.  As we have explained, "[t]he purpose of particularizing the items to be seized is to insure that when the warrant is executed, nothing is left to the officer's discretion." United States v. Hurt, 795 F.2d 765, 772 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 707 (9th Cir. 1987).  Because Holcomb's computer contained thousands of files, and because the dominion and control provision did not contain any temporal limitations, the examiner exercised unfettered discretion to decide which files to scroll past and which files to open and examine.  That type of broad discretion raises significant particularity concerns.

In assessing whether a provision in a warrant is sufficiently particular, we also consider whether it would have been "reasonable" for the government to "provide a more specific description of the items [to be searched] at that juncture of the investigation." United States v. Banks, 556 F.3d 967, 973 (9th Cir. 2009); see also United States v. Cardwell, 680 F.2d 75, 78 (9th Cir. 1982) ("Generic classifications in a warrant are acceptable only when a more precise description is not possible.").  Here, the government was well aware of the relevant time period, as it was investigating a single incident that took place in a particular location on a specific date.  Every provision of the second warrant except for the dominion and control provision was limited to the period surrounding that incident.  The government has failed to give a persuasive reason, and we can discern none, why the dominion and control provision could not have been similarly limited to the same period.

Accordingly, we conclude that the dominion and control provision was insufficiently particular.

Both because it was overbroad and because it was insufficiently particular, the dominion and control provision effectively transformed the second warrant into a general warrant. Although the other provisions of the warrant limited the warrant's scope to narrow categories of evidence that were relevant to the alleged rape of JJ and for which there was probable cause to search, the dominion and control provision effectively allowed the government to engage in the sort of "exploratory rummaging in a person's belongings" that the Fourth Amendment's warrant requirement was intended to prevent. United States v. Wright, 667 F.2d 793, 797 (9th Cir. 1982) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)).

### C. Although the Initial Search May Have Proceeded in Good Faith, Probable Cause Dissipated, As Did Any Good Faith.

Under the good-faith exception to the exclusionary rule, "'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" United States v. Leon, 468 U.S. 897, 922 (1984) (quoting United States v. Ross, 456 U.S. 798, 823 n.32 (1982)). "'[I]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'" Messerschmidt v. Millender, 565 U.S. 535, 547 (2012) (quoting Leon, 468 U.S. at 921). Thus, "evidence seized under a later-invalidated warrant is

admissible if the 'officers conducting the search acted in good faith and in reasonable reliance on the warrant.'" United States v. King, 985 F.3d 702, 710 (9th Cir. 2021) (quoting United States v. Kow, 58 F.3d 423, 428 (9th Cir. 1995)). The exception applies only if "the officers acted in an objectively reasonable manner." Messerschmidt, 565 U.S. at 546.

In our initial opinion, we held that the officers lacked good faith from the outset of the search because, at a minimum, any reasonable officer would have known that the time-unlimited dominion and control provision rendered the second warrant an impermissible general warrant. Holcomb, 132 F.4th at 1131–35. But potentially analogous cases, such as Adjani, 452 F.3d 1140,[4] may have led the officers to believe that such a broad search was lawful. Accordingly, we now assume, without deciding, that the officers acted in

---

[4] There, we observed that "[c]omputer files are easy to disguise or rename," so the government need not "trust the suspect's self-labeling when executing a [search] warrant." Adjani, 452 F.3d at 1150; see also United States v. Hill, 459 F.3d 966, 977–78 (9th Cir. 2006) (similar). Although we assume that, under Adjani, Hill, and other cases, the officers here may have reasonably believed that the second warrant was not impermissibly expansive, it is worth noting that those cases are distinguishable. Naming and labeling conventions, like those discussed in Adjani and Hill, are distinct from date and time stamps, which are at issue here. Although a sophisticated computer user can readily alter the date and time associated with a computer file, she cannot easily change that file's internal metadata, many of which reflect the actual date and time that file was created. As amici explain, digital forensic examiners can discern the actual date and time when a file was created, as well as a suspect's efforts to disguise that date and time. See Brief for Digital Forensic Examiners as Amici Curiae Supporting Defendant-Appellant, United States v. Holcomb (No. 23-469), at 7–12. Moreover, here, the government offered no evidence whatsoever to suggest that anyone had altered the date and time stamps associated with Holcomb's files.

good faith when they initiated the search for evidence relating to the alleged rape. We assume, in other words, that it was not necessarily clear to them that the expansive dominion and control provision rendered the entire warrant infirm.

But probable cause dissipated when the officers discovered the video of the alleged rape, showing them that the alleged crime described in the warrant—the rape of JJ on January 27, 2020—almost certainly had <u>not</u> occurred. Probable cause at the time of the warrant's issuance is not dispositive. "If probable cause is established at any early stage of the investigation, it may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity." <u>United States v. Ortiz-Hernandez</u>, 427 F.3d 567, 574 (9th Cir. 2005) (per curiam). "As a corollary of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." <u>Id.</u> (ellipsis, citation, and internal quotation marks omitted). Even in the context of qualified immunity, we have held that "[a] reasonable officer would know that participation in an ongoing seizure after any probable cause had dissipated violates the Fourth Amendment." <u>Nicholson v. City of Los Angeles</u>, 935 F.3d 685, 691 (9th Cir. 2019); <u>see also</u> <u>United States v. Grubbs</u>, 547 U.S. 90, 95 n.2 (2006) (holding that "probable cause may cease to exist after a warrant is issued"; citing a Sixth Circuit case for correctly "recognizing that a fruitless consent search could dissipate the probable cause that justified a warrant"; and citing a Second Circuit case for correctly holding that probable cause must "exist as of the time of the search and not simply as of

some time in the past" (brackets, citations, and internal quotation marks omitted)).

Other circuits are in accord.  See United States v. Dalton, 918 F.3d 1117, 1128 (10th Cir. 2019) (holding that "probable cause becomes stale when new information received by the police nullifies information critical to the earlier probable cause determination"); United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993) ("[T]he officers had a duty to provide the magistrate judge with any information which would undercut the warrant's validity. The officers could not simply rest on a warrant they had already received when this information came to light."); United States v. Bowling, 900 F.2d 926, 932 (6th Cir. 1990) (holding that "[p]robable cause must exist at both points in time":  "at the time of the warrant's issuance" and at "the time of its execution"); United States v. Marin-Buitrago, 734 F.2d 889, 894 (2d Cir. 1984) (holding that a search is lawful only if "probable cause continues to exist" at the time that the search is executed).

Here, once Detective Neufeld began searching Holcomb's computer, he quickly discovered a video recording of the bedroom.  He reported to Detective Kuschnereit that the video showed Holcomb and JJ having sex starting at 7:56 p.m., taking a break, and then returning to the bedroom, at which point JJ "is seen giving [Holcomb] a blowjob on the bed."  At 11:55 p.m., "JJ says 'I'm done,' gets up and then leaves the room."  "JJ looked like she was fully participating and it didn't look like [Holcomb] was forcing her head down during this blowjob."  "With the exception of having been forcibly restrained during fellatio, the details of the sexual encounter otherwise matched what JJ had reported."

The next morning, Detective Kuschnereit watched the video. He described the episode as follows. "According to JJ this was when the originally consensual sexual encounter changed as [Holcomb] held her head down to his penis forcibly." Holcomb is lying on his back. "JJ does appear to be willingly performing oral sex on [Holcomb]." Holcomb's left hand "reach[es] over to touch [JJ's] butt, while his right hand is resting on the upper part of his chest holding a vape device." "At no point in the video clips that I saw did I observe [Holcomb] appearing to restrain JJ forcibly."

After viewing the video, the officers knew that probable cause no longer existed. The only evidence of forcible compulsion found in the affidavit (or elsewhere) was JJ's report that Holcomb placed his hand on her head and restrained her with his hand. Not only did the video not show Holcomb using any physical restraint, the video showed the opposite—that he did not place his hand on her head or anywhere near her head. Instead, he rested his right hand on his chest, holding a vape device, and he placed his left hand on "[JJ's] butt." As Detective Neufeld reported, there was no "forcibl[e] restrain[t]." As Detective Kuschnereit reported, "[a]t no point" did Holcomb "appear[] to restrain JJ forcibly." JJ's account matched the video in nearly every detail—including the time (roughly 8:00 p.m. to midnight), the location (bedroom), and the events (a first sexual encounter involving intercourse, followed by a break, and then a second sexual encounter involving oral sex that ended with JJ stating "I'm done"). The only mismatch between JJ's account and the video was that the video showed that Holcomb did not forcibly compel her. The evidence of rape rested entirely on JJ's subjective report, and the objective video evidence refuted her report. Because probable cause no longer existed, the warrant no longer justified the

officers' search of Holcomb's computer. In the circumstances, the officers' failure to realize that probable cause had dissipated was not "objectively understandable and reasonable." Maryland v. Garrison, 480 U.S. 79, 88 (1987).

Nor were the officers acting in good faith. See Davis v. United States, 564 U.S. 229, 239–40 (2011) (discussing the good-faith exception in the context of police error). To the contrary, under binding and longstanding precedent, no reasonable officer would continue searching after probable cause dissipated, and no reasonable officer could have concluded that probable cause existed after watching the video. Grubbs, 547 U.S. at 95 n.2; Nicholson, 935 F.3d at 691.[5] Phrased differently, by continuing to search in reliance on a stale warrant after viewing the exculpatory video, the officers "exhibit[ed] 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights," thus warranting exclusion of the evidence. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 144 (2009)).

The government does not dispute the principle that officers must stop searching if later-discovered evidence dissipates probable cause. Instead, the government offers four distinct arguments as to why the continued search was justified here. None is persuasive.

---

[5] As we detailed in our initial opinion, the parties dispute the precise legal standard applicable to good-faith inquiries. See Holcomb, 132 F.4th at 1131–33. We need not resolve that legal dispute because, even assuming that the government's preferred qualified-immunity standard applies, see id. at 1131–32, the legal principles that rendered the officers' actions unreasonable are all clearly established.

First, the government suggests that probable cause dissipates only "when officers become aware that there was no basis to conclude the person had engaged in any criminal conduct." To the extent that the government argues that there must be no inculpatory evidence at all, the government is mistaken. What must dissipate is not all suspicion of guilt; what must dissipate is probable cause, which means a "fair probability," or "substantial chance," that the defendant has committed the crime being investigated. Redding, 557 U.S. at 371; see, e.g., United States v. Lopez, 482 F.3d 1067, 1073 (9th Cir. 2007) (describing the dissipation doctrine as follows: "In some instances there may initially be probable cause . . . but additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime." (emphasis added)); Ortiz-Hernandez, 427 F.3d at 574 (holding that probable cause "may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity" (emphasis added)).

Second, the government suggests that, because Holcomb may have taken non-consensual photographs of JJ, probable cause existed as to a different crime, thereby justifying the continued search. But the warrant authorized a search only for evidence of rape in the second degree. The government cites no authority suggesting that a warrant to search for one crime authorizes a full search for any crime at all, even after probable cause has dissipated as to the crime listed in the warrant. To the contrary, if officers find evidence of a different crime, they must stop their search and seek a warrant for that separate crime. The officers clearly were aware of that limitation because they took precisely those actions when they discovered evidence of child rape. And

the legal principle is well established. See, e.g., Garrison, 480 U.S. at 87 (noting that "the purposes justifying a police search strictly limit the permissible extent of the search"); Andresen v. Maryland, 427 U.S. 463, 481–82 (1976) ("The warrants, accordingly, did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime [described in the warrant].").

Third, and similarly, the government suggests that, because Holcomb may have sexually assaulted JJ by placing his "finger in her anus without her consent," probable cause existed as to his commission of rape in the third degree, thereby justifying the continued search. But the only factual support for that assertion is the officer's report that Holcomb "does reach his left hand around to touch her butt" during fellatio, while Holcomb's right hand rested on his own chest. "Touch[ing] her butt" without any physical restraint and without any apparent reaction by JJ is far afield from JJ's allegation that, during a violent struggle while JJ repeatedly tried to pull away, Holcomb forcibly restrained her head with one hand while, using his other hand, his "finger penetrat[ed] her anus . . . causing her great pain of 8 on a scale of 1-10." The video evidence did not support a determination of probable cause as to rape in the third degree.

Fourth, the government suggests that, notwithstanding the video evidence, probable cause still existed as to forcible compulsion. But the evidence and theories described by the government amount to no more than speculation or, at most, reasonable suspicion—which is insufficient to justify a continued search.

As discussed above, the video that the officers viewed matched JJ's description as to all details except for the

alleged forcible compulsion. It is entirely speculative to suggest that perhaps there was a video of a third sexual encounter, particularly when the police officers arrived only about thirty minutes after the second sexual encounter ended. Similarly, it is entirely speculative to suggest that additional angles of the encounter would somehow show Holcomb's hands placed on JJ's head, forcing her to continue oral sex, instead of resting placidly on his own chest holding a vape device and "touch[ing] [JJ's] butt."

Nor was there a substantial chance that Holcomb had doctored the video in a way that included all aspects reported by JJ except for the alleged criminal conduct of forcing her head down while she repeatedly struggled and said "no." Neither detective reported any evidence that Holcomb had altered the video in any way—the detectives reported no glitches or oddities in the video that might suggest tampering.[6] Nothing in the reports stated or implied that the detectives thought that Holcomb could have altered the video that they watched.

Finally, the prosecutor's presence while the officers watched the video does not change the calculation meaningfully. Cf. Messerschmidt, 565 U.S. at 554–55

---

[6] Detective Neufeld viewed the surveillance video and reported a summary of the entire video to Detective Kuschnereit. Neufeld described the full span of the video, from the arrival of JJ and Holcomb at the residence until the end of the sexual encounters. In order to provide that report, Neufeld must have watched the entire video. The morning after providing that report, Neufeld showed Kuschnereit relevant portions of the video, which Kuschnereit described as "clips." The dissenting opinion latches onto Kuschnereit's word choice to suggest that other parts of the video may have contained glitches. Dissent at 63. But nothing in the record suggests, and the government does not assert, that any portion of the video contained any glitches or oddities that might have suggested doctoring.

(holding that review by a prosecutor is a factor in assessing objective reasonableness for purposes of qualified immunity). The officers reported that they continued the search pursuant to "standard procedures" to review all files on a computer, no matter whether probable cause had dissipated. Notwithstanding any standard procedure or any direction from a prosecutor, the officers knew or should have known that Holcomb almost certainly had <u>not</u> raped JJ on the night in question. In the circumstances, the continued search, for evidence of a crime in the absence of probable cause, was impermissible and not undertaken in good faith.

For its part, the dissenting opinion disagrees that probable cause dissipated, speculating that Holcomb could have doctored the video or that additional angles of the sexual encounter somehow could show a forcible rape. For all the reasons stated above, we disagree that probable cause remained after the detectives viewed the video that showed a consensual sexual encounter and that showed conduct directly contradicting JJ's account of criminal behavior by Holcomb.

The dissenting opinion appears also, at times at least, to disagree with the legal rule that we apply: officers may not continue searching once probable cause dissipates. The dissenting opinion goes off track at the outset, commingling situations in which new information dissipates probable cause with situations in which new information undermines, but <u>does not dissipate</u>, probable cause. Dissent at 40–41. And the dissenting opinion focuses not on a duty to stop searching but on a purported "duty to report" to a magistrate

when new information arises.[7] Id.  Whatever legal rules may exist when new information casts doubt on, but does not destroy, probable cause, we simply do not address that situation.  Much of the dissenting opinion's analysis thus appears irrelevant.  But because the dissenting opinion develops legal rules and appears, at times, to apply them to the facts of this case, we explain why the dissenting opinion's analysis is inapt here.

The dissenting opinion agrees that a search may not proceed once probable cause no longer exists, but only if two additional conditions are met: (1) probable cause must dissipate before the search begins, and (2) the new information must materially change the facts in the search warrant affidavit, a test that apparently is narrower than whether probable cause dissipated.  Dissent at 58–60.  The government does not read the Fourth Amendment's protections so narrowly, and for good reason:  those artificial constraints are inconsistent with caselaw and with the Fourth Amendment's requirement of reasonableness.

The dissenting opinion's first condition is that the searching officers become aware that probable cause no longer exists before the search has begun.  If new facts arise after a search has begun, then the dissenting opinion permits officers to disregard those facts entirely, even when the officers know that probable cause no longer exists.  The dissenting opinion's proposed condition is directly contrary to the rule that officers "may not disregard facts tending to dissipate probable cause." Ortiz-Hernandez, 427 F.3d at 574 (citation omitted).

---

[7] Indeed, more than two dozen times the dissenting opinion uses the phrase "duty to report," a phrase notably absent from this opinion. Dissent at 41–43, 48, 52, 55, 58–60, 62–63, 71 n.9.

No case supports the dissenting opinion's contrary rule. The dissenting opinion derives its first condition from a handful of cases in which officers happened to discover new facts that tended to dissipate probable cause before a search had begun. E.g., Dalton, 918 F.3d at 1128; Marin-Buitrago, 734 F.2d at 894. Courts in those cases naturally report what occurred and frame the analysis in that context. But no case holds—or even suggests—that, had the officers discovered the new facts after beginning the search, the officers could have disregarded the new facts and continued to search.

To the contrary, courts that assess situations in which the searching officers discover new facts after beginning a search do not simply hold that the officers may disregard those new facts. In Bowling, for example, one set of officers obtained a search warrant and, after the search began, were informed by other officers of information that potentially dissipated probable cause. 900 F.2d at 933. The Sixth Circuit did not hold that, because the search had begun, the dissipation of probable cause was irrelevant; instead, the court analyzed at length whether probable cause had dissipated. Id. at 933–34. Notably, the Supreme Court cited Bowling with approval for the proposition that new information "could 'dissipate the probable cause that justified a warrant.'" Grubbs, 547 U.S. at 95 n.2 (brackets omitted) (quoting Bowling, 900 F.2d at 932).

The Tenth Circuit's decision in Harte v. Board of Commissioners, 864 F.3d 1154, 1182–87 (10th Cir. 2017),[8] is perhaps even more on point. Officers suspected an illegal

---

[8] We cite Part II-B-1 of Judge Phillips' opinion, which was joined in full by Judge Lucero, id. at 1164 n.5, and thus was a majority opinion. The third jurist, Judge Moritz, did not disagree; she simply declined to reach the issue of dissipation of probable cause. Id. at 1203–04.

marijuana-grow operation, obtained a search warrant, began executing the search warrant, and found: tomato plants. Id. at 1182. The Tenth Circuit held that, "[f]or a search to be reasonable, probable cause must exist at all times during the search." Id. (emphasis added). Viewing the facts in the light most favorable to the plaintiffs, the court held that the continuation of the search after discovering exculpatory information violated the Fourth Amendment, because "what the deputies learned early on in the search dissipated any probable cause to continue searching." Id. at 1184. "[T]he deputies violated the Fourth Amendment's reasonableness requirement by continuing to search after probable cause had dissipated." Id. at 1187.

The dissenting opinion spills much ink trying to reconcile its analysis with Harte, wringing its hands over the precise time at which probable cause dissipated during the search in Harte. Dissent at 53–58. But the precise time is irrelevant. The key, indisputable point is that the Tenth Circuit clearly held that, during the execution of a warrant search, probable cause dissipated, and the officers' continued search after that time violated the Fourth Amendment. Harte, 864 F.3d at 1182–87. The dissenting opinion's proposed condition has no support in—and directly contradicts—precedent.

The dissenting opinion's proposed condition also conflicts with the Fourth Amendment's reasonableness requirement. Consider a hypothetical case of precious jewels missing from a local museum. Many signs point to an eccentric millionaire's having stolen them: he has a history of jewel thefts, he is known to covet the missing jewels in particular, and witnesses report seeing him near the museum around the time that the jewels went missing. Probable cause exists, officers obtain a warrant to search the

suspect's mansion thoroughly, and they speed off toward the rascal's house.  On the way, the officers receive a phone call from headquarters:  the jewels have been discovered in the museum, museum staff confess that they placed the jewels in the wrong storage safe by accident, and surveillance video confirms the mix-up.  Probable cause as to the suspect has dissipated.  If we understand correctly, the dissenting opinion agrees that the officers may not execute the search warrant in the circumstances, because probable cause dissipated before officers began searching the mansion.

But imagine if the discovery occurred just <u>after</u> the officers began searching the first of the mansion's twenty rooms.  Then, applying the dissenting opinion's rule that new information must arise before a search has begun, the officers may continue searching the remaining nineteen rooms—looking in every nook and cranny of the house, even though everyone knows that the jewels are elsewhere and that the suspect is innocent—all because of the happenstance that the discovery occurred <u>after</u> the search began.  The dissenting opinion's proposed condition is flatly <u>un</u>reasonable, as well as unsupported by precedent.  The Fourth Amendment does not impose an artificial timing requirement that probable cause must dissipate by a particular deadline or else officers can simply ignore new evidence.[9]

---

[9] In other circumstances, such as an ongoing, fast-developing search by several officers, the reasonableness of a continued search or the good faith of the officers may present questions concerning timing:  when did which officers discover what information and how did they respond?  And, of course, if the officers discover evidence of a different crime <u>before</u> probable cause dissipates, then the Fourth Amendment poses no barrier to the use of that evidence.  But those issues are not present here.

Confronted with our museum hypothetical, the dissenting opinion relents, agreeing that a continued search would violate the Fourth Amendment.  Dissent at 69–70.  The dissenting opinion then falls back on the arguments as to why, in the dissenting opinion's view, probable cause did not dissipate here.  Id.  The dissenting opinion's condition—that new information must arise before a search has begun—thus appears to apply only when new information undermines, but does not dissipate, probable cause.  We reiterate that nothing in our opinion addresses that situation.  The dissenting opinion's lengthy digression is inapt.

The dissenting opinion's proposed second condition fares no better:  the newly discovered information must "definitely and materially change the facts specified in the warrant affidavit."  Dissent at 60.  The dissenting opinion derives this condition from cases in which courts considered new information "material" if that information meant that probable cause no longer existed.  See e.g., Dalton, 918 F.3d at 1127 (asking whether the new information "nullifies the probable cause articulated in a warrant"); Marin-Buitrago, 734 F.2d at 895 (holding that the new information at issue there was not material because it "would not affect the finding of probable cause").  To the extent that the dissenting opinion means that new information must nullify probable cause, then we of course agree.

---

Detective Neufeld watched the surveillance video, concluded that JJ appeared to participate willingly, and soon after showed the video to Detective Kuschnereit, who reached the same conclusion.  It was only after the officers decided nevertheless to continue the search that Detective Neufeld found the videos leading to the criminal charges here.  Because of the clean break between the discovery of the surveillance video and the decision to continue the search, no nuanced question of timing arises here.

But the dissenting opinion appears to understand this condition to demand more: the newly discovered information must not only dissipate probable cause, but it also must not have been contemplated by the affidavit supporting the application for the search warrant. Dissent at 60–62. Here, for example, the dissenting opinion points out that the affidavit asserted that Holcomb's devices "may contain exculpatory evidence," and that the evidence may "corroborate or refute the details of . . . the statements of a victim." Id. at 61 (emphasis by the dissenting opinion) (quoting the affidavit). Because the surveillance video was, in fact, exculpatory, and because the video did, in fact, refute JJ's story, the dissenting opinion concludes that the content of the video did not "definitely and materially change the facts specified in the warrant affidavit." Id. at 60. We do not see how new evidence that dissipates probable cause ever can be considered immaterial. Once probable cause dissipates, officers no longer have authority to search (barring an emergency or an exigency not implicated here).

Moreover, the dissenting opinion's curious interpretation has no support in the caselaw: courts ask simply whether probable cause dissipated, not whether the affidavit supporting the search warrant blandly stated that the search may uncover exculpatory evidence as well as inculpatory evidence. Returning to our museum example, suppose that the officers had informed the magistrate that some facts known at the time suggested that perhaps museum staff had misplaced the jewels. Although the discovery that, in fact, the staff had misplaced the jewels nullified probable cause as to the suspect, the discovery would not be "material" information under the dissenting opinion's analysis because the magistrate knew of the possibility all along. So even though probable cause plainly

no longer existed, the officers would be free to execute the warrant on the sole ground that the new information was not "material" as defined by the dissenting opinion.

The dissenting opinion's analysis overlooks the key difference between a possibility of uncovering exculpatory information and the actuality of uncovering strongly exculpatory information. The critical question always remains whether probable cause exists. The magistrate would not have issued the warrant had the magistrate known that museum staff had misplaced the jewels, whether or not that information qualifies as "material" under the dissenting opinion's definition.

The same analytical flaw exists with respect to the dissenting opinion's assessment of the facts here. The magistrate was informed that the video might be exculpatory and that the video might refute JJ's story; but that mere possibility did not negate probable cause at that time. Knowledge that the video in fact was exculpatory and in fact fully refuted JJ's story about the alleged rape in all criminal respects clearly changed the likelihood that Holcomb had raped JJ and thus was "material" in any meaningful sense of the term.

As with the first condition, the dissenting opinion appears to relent as to whether the second condition applies when probable cause dissipates (as opposed to when new information merely casts doubt on probable cause). The dissenting opinion states that it reaches its conclusion that the continued search here was unreasonable because of "the totality of the circumstances," not merely because of the statements in the affidavit supporting the warrant. Dissent at 61–62 n.6 (emphasis by the dissenting opinion). We again emphasize that we address solely situations in which

probable cause dissipates after the discovery of new information. In those situations, a continued search violates the Fourth Amendment, whether or not the affidavit generically mentioned the possibility of discovering exculpatory information.

To the extent that the dissenting opinion requires any inquiry beyond whether probable cause dissipated, we reject that requirement as inconsistent with the Fourth Amendment. Here, once officers reviewed the surveillance video, probable cause dissipated. In the circumstances, the officers' continued search was neither reasonable nor taken in good faith. The continued search violated the Fourth Amendment.

D. The Disputed Evidence Was Not in Plain View.

The government also argues that the seizure of the three videos depicting child sexual abuse was independently authorized by another exception to the warrant requirement: the plain view doctrine. Under that doctrine, the government may seize evidence without a valid warrant so long as government officials are "lawfully searching the area where the evidence is found" and "the incriminatory nature of the evidence [is] immediately apparent." United States v. Stafford, 416 F.3d 1068, 1076 (9th Cir. 2005). The burden of demonstrating that both requirements are satisfied lies with the government. See United States v. Chesher, 678 F.2d 1353, 1356 (9th Cir. 1982). The government cannot meet its burden because the officers were not "lawfully searching the area where the evidence was found." The officers found the three videos while executing a general warrant, after probable cause had dissipated along with their good faith. When "the plain view seizure was in the context of officers executing an essentially general warrant," the

"justification for the plain view is . . . absent." United States v. Spilotro, 800 F.2d 959, 968 (9th Cir. 1986). The government thus fails to satisfy the first requirement of the plain view doctrine.

E. Suppression is the Appropriate Remedy.

Suppression is not automatic. Hudson v. Michigan, 547 U.S. 586, 591 (2006). Suppression is appropriate only "where its deterrence benefits outweigh its substantial social costs." Id. (quoting Penn. Bd. of Probation & Parole v. Scott, 524 U.S. 357, 363 (1998)) (internal quotation marks omitted).

We acknowledge the considerable social cost of suppression in this case. The government cannot use strong evidence that Holcomb committed the heinous crime of raping his seven-year-old daughter. Nonetheless, we see no broader, systemic social cost—and the government suggests none—to suppressing the evidence here. See id. at 595–96 (discussing the significant systemic social costs at issue in that case).

The officers here sought, and obtained, a general warrant that authorized them to rummage through years' worth of data, including intimately personal data, stored in Holcomb's computer and phone. Cf. Riley v. California, 573 U.S. 373, 393–94 (2014) (discussing the constitutionally significant distinction between digital data and non-digital items such as a pack of cigarettes). The officers in fact executed the warrant in that indiscriminate manner, declining to limit the search to the relevant timeframe and watching old videos of, for example, consensual sex between Holcomb and his then-girlfriend. Most importantly, when the officers found exculpatory evidence that dissipated probable cause altogether, they nevertheless continued to

search pursuant to unspecified "standard procedures." The deterrent effect of suppression here is thus significant and outweighs the social cost, even though the unconstitutionally obtained evidence disclosed a brutal and shocking crime. See Davis, 564 U.S. at 240 (suggesting that suppression may be appropriate when officers violate the Fourth Amendment "deliberately, recklessly, or with gross negligence" and when the case involves "systemic negligence on the part of law enforcement" (citation and internal quotation marks omitted)); Ker v. California, 374 U.S. 23, 33 (1963) (noting that the Fourth Amendment "protects all, those suspected or known as to be offenders as well as the innocent" (citation omitted)).

The district court's ruling on Holcomb's motion to suppress is **REVERSED**, Holcomb's conviction and sentence are **VACATED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

SUNG, Circuit Judge, dissenting:

In this case, the police generally investigated an alleged rape as they are supposed to. An adult woman ("JJ") alleged that she and the defendant, Holcomb, had consensual sex several times, but when she wanted to stop, he forced her to continue without her consent. The police interviewed JJ and documented her allegations in detail. The police then obtained and promptly executed a warrant to search Holcomb's home for evidence of the alleged rape and seize his desktop computer and cellphone. During that search, the police saw in plain view a text exchange between Holcomb and his wife about JJ's rape allegations in which Holcomb wrote that he had "handled this shit." Holcomb does not challenge this warrant's validity or its execution. Then, the police interviewed Holcomb. Holcomb told the police that his desktop computer and laptop computer likely contained multiple videos of the interaction captured by different cameras—including at least one surveillance camera and his laptop camera—positioned at different locations in the bedroom. And, Holcomb maintained, these videos of the interaction from different angles would show that the sexual relations were consensual. Holcomb encouraged the police to watch the videos, provided them with the password for his desktop computer, and consented to a search of both computers and his cell phone. But, before the police could execute that search, he withdrew his consent.

Accordingly, the police went to the magistrate judge to obtain a warrant to search for the videos. They provided the magistrate judge with a detailed affidavit, which comprehensively and accurately detailed JJ's allegations, Holcomb's belief that the computers contained multiple exculpatory videos showing the alleged rape from different

angles, the fact that Holcomb had initially provided consent to search the devices and then withdrew it, and the possibility that the evidence could "be used to corroborate or refute the details" of JJ's statements.

It is undisputed that the affidavit was complete and accurate; there is no contention that the police misrepresented or omitted any material facts. It is undisputed that the affidavit provided a sufficient basis for probable cause at the time the magistrate judge issued the warrant and that the police executed the warrant in a timely fashion. And it is undisputed that, while in the middle of executing the valid warrant, the police found a video (or video clips) that, as Holcomb predicted, appeared to show a consensual sexual encounter. Although Detective Neufeld's search of Holcomb's devices was incomplete, he showed the video clips to Detective Kuschnereit and the prosecutor. After viewing the clips, the prosecutor instructed the police to continue "processing the other hard drives as per standard procedures and to continue looking for additional surveillance videos or other angles that may be present," as expressly authorized by the search warrant.[1] At that point,

---

[1] When describing the facts, the majority states that, after Detective Kuschnereit and the prosecutor viewed the first video, the detective "directed the Washington State Patrol Crime Laboratory to 'stop all testing [of the collected samples] except for the required testing' because he expected that the case would be dismissed soon." Maj. at 9. The majority tells only part of the story. The record shows that it was the crime lab's forensic scientist DNA supervisor—not the police or the prosecutor—who decided to stop all non-required DNA testing. The same morning that Kuschenreit and the prosecutor watched the video, the crime lab supervisor, who was unaware of the video's existence, emailed Kuschenreit to explain that she had decided to stop all testing except that which was "required by law" because DNA testing cannot

the police found the child pornography that led to Holcomb's conviction here.

When reviewing the execution of a valid search warrant, we ask whether the officers' actions were objectively reasonable "in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Applying that standard here, I conclude that the officers' actions in this case were objectively reasonable.[2] Indeed, the only circuit case that addresses the discovery of new information *during* the execution of a warrant, *Harte v. Board of Commissioners*, 864 F.3d 1154 (10th Cir. 2017), supports my conclusion that it was reasonable for the police to continue searching for the remaining videos. *See infra* at 52-58.

The majority concludes that the police's discovery of the first video of Holcomb and JJ caused probable cause to dissipate, and that "under binding and longstanding precedent, no reasonable officer would continue searching

---

"provide any useful information" where the victim and suspect had prior consensual sex; additionally, she noted, the lab was "operating under a crushing backlog." In response, Kuschnereit stated that the supervisor's email "ma[de] sense" and was "very timely" because they had "just located some additional exculpatory evidence so it sounds like the case will be dismissed." In a subsequent letter to the police department, the prosecutor stated: "At the time I viewed the evidence, the search had not been completed. The search of the electronics seized in this incident still needed to be completed and a full report needed to be written. The filing or dismissal of charges does not render an investigation open or closed."

[2] Unlike the majority, *see* Maj. at 26-27, I conclude that the prosecutor's directive to continue searching for the remaining videos weighs in favor of concluding that the police's actions were reasonable here. *See Messerschmidt v. Millender*, 565 U.S. 535, 554-55 (2012) (holding that review by a prosecutor is a factor in assessing objective reasonableness for purposes of qualified immunity).

after probable cause dissipated." Maj. at 23. It further concludes that the evidence the police discovered while continuing to execute the search warrant must be suppressed. *Id.* at 36-37. In reaching this conclusion, the majority primarily relies on a line of out-of-circuit cases in which the police learned new information that undermined probable cause after they obtained a search warrant but *before* they started to execute it, and the courts held that the police had a duty to refrain from executing the warrant and report the new information to the magistrate so the magistrate could determine whether the warrant was still supported by probable cause. Notably, under this line of cases, the duty to report arises even when the new information does *not* completely dissipate probable cause. If the police violated the duty to report but the new information did not completely dissipate probable cause, then the court will not suppress evidence as a remedy. *See infra* at 58. For clarity, I use the term "undermine" instead of "dissipate" when referring to information that affects probable cause enough to trigger the duty to report but may or may not completely dissipate probable cause.

In my view, this line of cases does not require the police to stop searching and report back to the magistrate when the police learn new information that undermines probable cause *while* executing the warrant. The majority insists that the timing does not matter, but they do not acknowledge that this line of cases imposes the duty to report back to the magistrate even when the new information does not completely dissipate probable cause. And I fear requiring the police to stop executing a warrant and report back to the magistrate whenever new information undermines probable cause is both impractical and unnecessary to prevent unreasonable execution of search warrants.

Further, even assuming this line of cases is applicable here such that the duty to report may arise during the execution of a warrant, I conclude that the police in this case were not obligated to stop executing the warrant and report the first video to the magistrate because they had already disclosed in the warrant affidavit that they expected to find multiple videos and that Holcomb believed the videos would be exculpatory. And even assuming the police should have reported the first video, suppression of the child pornography evidence is not warranted because probable cause had not completely dissipated. Even though the first video was exculpatory, considering the video together with the other information in the affidavit, there was still probable cause to search Holcomb's computers for the other videos that Holcomb himself told the police to look for. *See infra* at 63-70.

Although the majority relies on a line of cases that requires the police to refrain from executing a warrant and report to the magistrate whenever probable cause is undermined, they maintain that my discussion of this duty to report is irrelevant because they are holding only that the police must stop executing a warrant when the police discover information that completely dissipates probable cause; according to the majority, its opinion "does not address" whether the police may continue executing a warrant when they discover information that merely undermines probable cause. Maj. at 28. The problem is that, under the majority's approach, whenever the police learn information that undermines probable cause while executing a warrant, the police as a practical matter *must* stop executing and reassess whether probable cause continues to exist—if they do not do so, and a court later concludes that probable cause was not merely undermined but completely

dissipated, then any evidence they found will be suppressed. And even though the majority do not take a position on whether, under such circumstances, the police may rely on their own discretion to determine whether probable cause has been merely undermined or completely dissipated, or instead must report to the magistrate—under the line of cases on which the majority relies, the answer is clear: the police have a duty to report information that merely undermines probable cause because it is the magistrate, not the police, who must determine whether probable cause for the warrant still exists. *See, e.g., United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) ("[I]t is the neutral magistrate, not the executing officers, who determines whether probable cause continues to exist."); *United States v. Bowling*, 900 F.2d 926, 933 (6th Cir. 1990) ("[O]fficers should not rely on their own discretion, but should instead resort to a neutral magistrate, to determine whether probable cause to conduct a search exists."). If the validity of the search warrant's *execution* depends on the continued existence of probable cause (as the majority holds), and the police must not rely on their own discretion to determine whether probable cause continues to exist when they have obtained a warrant but not yet started executing it (as *Marin-Buitrago* and *Bowling* held), then why would the majority allow the police to rely on their own discretion to determine whether probable cause still exists when they are executing a search warrant? In my view, we should not be requiring the police to reassess the existence of probable cause while executing a search warrant and asking whether the police should have known that probable cause was not merely undermined but completely dissipated. Instead, as explained, I believe the question presented is whether the police's execution of the warrant was objectively reasonable under the totality of the

circumstances. But even assuming, as the majority holds, that the police should have reassessed probable cause while executing the warrant, I conclude that probable cause did not completely dissipate in this case.

Separately, I disagree with the majority's consideration of whether the good faith exception for reliance on a later-invalidated warrant applies. *See* Maj. at 23. The majority assumes that the warrant to search Holcomb's devices was valid and concludes that the *execution* of the warrant was unreasonable. *Id*. But "where [as here,] the violation lies in the execution of the warrant, not the validity of the warrant," the good-faith exception for reliance on a later-invalidated warrant "is not relevant." *United States v. Gantt*, 194 F.3d 987, 1006 (9th Cir.1999), *rev'd on other grounds, United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008).

Because I conclude that the evidence of child pornography should not be suppressed on the ground that the execution of the warrant was unreasonable, I reach the issue the majority avoids: whether the evidence should be suppressed because the warrant's dominion and control provision was invalid. The government argues suppression is not warranted because the police found the evidence while searching under the valid portions of the warrant, and alternatively, because the police relied in good faith on the later-invalidated provision of the warrant. In my view, the merits of those arguments depend on facts that the district court should determine after conducting an evidentiary hearing. Additionally, the good faith exception for reliance on a later-invalidated warrant applies only if the police officers' reliance on the warrant was "objectively reasonable," but there is an intra-circuit conflict regarding the standard for objective reasonableness in the Fourth Amendment context. *Cf. United States v. Needham,* 718

F.3d 1190, 1195 (9th Cir. 2013) ("[T]he standard for granting qualified immunity is the same as the standard for objective reasonableness" in the context of a motion to suppress.); and *Manriquez v. Ensley*, 46 F.4th 1124, 1130 n.1 (9th Cir. 2022) ("[T]he qualified immunity standard is more 'forgiving' [of police errors] than the requirements of the Fourth Amendment.").   This intra-circuit conflict may be dispositive in this case, as demonstrated by the fact that the district court initially concluded this good faith exception does not apply because the warrant was "so facially deficient that no executing officer could reasonably presume it to be valid," *United States v. Holcomb*, No. CR21-75-RSL, 2022 WL 1539322, at *8 (W.D. Wash. May 16, 2022) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)), but on reconsideration, concluded the exception applies under the *Needham* standard, *United States v. Holcomb*, 639 F. Supp. 3d 1142, 1146-49 (9th Cir. 2022).

I.  No Precedent Required the Police to Stop Executing the Warrant and Report to the Magistrate When They Found the First Video.

The issue in this case is whether the police violated the Fourth Amendment when they continued executing the search warrant after finding the first video, and if so, whether we should suppress the evidence of child pornography as a remedy for that violation.   The majority asserts that their conclusion—that the police violated the Fourth Amendment and that the child pornography evidence should be suppressed—is rooted in "binding and longstanding precedent." Maj. at 23.  I disagree.  In my view, none of the cases relied on by the majority or that I have found establish that, when police learn information that undermines probable cause while executing a search warrant, they must stop executing the warrant and report back to the magistrate

for a new probable cause determination.  The relevant cases in which circuit courts have addressed the effect of new information on the validity of a search or seizure fall into five categories, each of which I discuss below.

1. The police must end an ongoing seizure or refrain from completing a warrantless arrest when they learn information that dissipates probable cause.  For instance, in *United States v. Ortiz-Hernandez*, the police suspected the defendant of street-level drug dealing, detained and strip searched him at a coffee shop, found "nothing incriminating," and then formally arrested him without a warrant.  427 F.3d at 572-73 (9th Cir. 2005).  Assuming there was at least reasonable suspicion to justify the initial detention and search, we concluded that the district court did not clearly err when it ruled that the police lacked probable cause to formally arrest Ortiz-Hernandez because they learned, based on the strip search, "that [he] had no drugs, no drug paraphernalia, and no other evidence of drug sales on his person."  *Id.* at 574-75.  For another example, in *Nicholson v. City of Los Angeles*, the police detained a group of teenagers for five hours after spotting them carrying what appeared to be a gun but turned out to be a toy replica.  935 F.3d 685, 690-91 (9th Cir. 2019).  Although the initial detention was reasonable, it was "soon apparent to the officers that the teenagers were unarmed, posed no threat to anyone, and were not engaged in any criminal activity."  *Id.* at 691.  Because the police continued to detain the teenagers "well after any probable cause would have dissipated," the duration of the teenagers' detention violated their Fourth Amendment right to be free from unlawful arrest.  *Id.*

2. When the police become aware of information that undermines probable cause *before* the warrant is issued, they must disclose it to the magistrate in the supporting affidavit.

*See*, *e.g.*, *United States v. Whitworth*, 856 F.2d 1268 (9th Cir. 1988). In *Whitworth*, the police first searched the defendant's home with his consent but found no evidence of a crime, and then they obtained a warrant to search his home again—without informing the magistrate of the prior consent search in the affidavit. *Id.* at 1281. Whitworth argued that this omission was material because the magistrate would not have found probable cause to conduct a second search if the magistrate had been aware of the prior search. *Id.* We agreed that it is improper "for law enforcement officials to withhold information regarding prior searches of the same premises from magistrates considering warrant applications" because such information may undermine the basis for probable cause. *Id.* However, we concluded that the suppression was not warranted in Whitworth's case because the affidavit, even when supplemented with the omitted information, "would still provide a magistrate with a substantial basis for concluding that probable cause existed." *Id.* at 1282.

3. The police cannot conduct a search in reliance on a search warrant if, because of a delay in the warrant's execution, the probable cause showing has become "stale." *See*, *e.g.*, *United States v. Grubbs*, 547 U.S. 90, 96 n.2 (2006) ("[P]robable cause may cease to exist after a warrant is issued," including because "the probable-cause showing may have grown 'stale' in view of the time that has passed since the warrant was issued.") (citing *United States v. Wagner,* 989 F.2d 69, 75 (2d Cir. 1993) and *Sgro v. United States,* 287 U.S. 206, 210–211 (1932)); *United States v. Gibson*, 123 F.3d 1121 (8th Cir. 1997). In *Gibson*, a judge issued a warrant to search the defendant's residence for drugs and drug paraphernalia, but the police did not begin executing the warrant until four days later. *Id.* at 1123. The

defendant filed a motion to suppress, arguing "that the search warrant was stale because probable cause dissipated during a four-day delay in executing the warrant." *Id.* at 1124. The district court denied the motion. *Id.* On appeal, the Eighth Circuit explained that "[a] delay in executing a search warrant may render stale the probable cause finding," but it held that the search warrant remained valid despite the four-day delay because the police continued to observe evidence of ongoing drug sales at the defendant's home during that time period. *Id.* at 1125. *See also Wagner*, 989 F.2d at 74 (assuming information in search warrant affidavit initially provided a basis for probable cause, probable cause would have dissipated during the six-week delay before police executed the warrant).

4. Four of our sister circuits have held that when the police discover information undermining probable cause *after* the warrant was issued but *before* they have begun executing it, they have a duty to report that information to the magistrate. *United States v. Dalton*, 918 F.3d 1117 (10th Cir. 2019); *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993); *United States v. Bowling*, 900 F.2d 926 (6th Cir. 1990); and *United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984).

In *Dalton*, the magistrate issued a warrant to search Dalton's house for firearms based on an affidavit stating that the police had attempted to conduct a traffic stop, the driver escaped and abandoned the car, the police found an AK-47 inside the car, that the car belonged to Dalton, and that based on police experience, "persons who have firearms in their vehicles also have firearms . . . in their homes." 918 F.3d at 1125, 1128. At the time that the police applied for the warrant, they believed Dalton had been driving his car and therefore possessed the AK-47 found inside it. *Id*. at 1128.

However, *before* the police began executing the warrant, they learned that someone else ("Wheeler") had been driving Dalton's car—and therefore, Wheeler, not Dalton, likely possessed the AK-47. *Id.* Although the probable cause to believe Dalton had firearms in his home was based on the belief that Dalton possessed the AK-47 in his car, the police did not inform the magistrate that the driver was actually Wheeler, and they executed the warrant at Dalton's house anyway. *Id.* at 1123. The Tenth Circuit held that "probable cause becomes stale when new information received by the police nullifies information critical to the earlier probable cause determination *before* the warrant is executed." *Id.* at 1128 (emphasis added). Applying that rule, the court concluded that, by the time the police executed the warrant to search Dalton's house, they lacked probable cause to search it, and therefore, the search was unlawful. *Id.*

In *Jacobs*, a magistrate judge issued a warrant to search a Federal Express package based on an affidavit stating that the police received a tip that the package contained drugs and that a drug-sniffing dog "exhibited an interest" in the package. 986 F.2d at 1233. Although the police knew the dog did not give a "full alert" to the package, they omitted that information from the warrant affidavit. *Id.* Then, *after* the warrant was issued but *before* the officers began executing it, a second drug-sniffing dog failed to show any interest at all in the package. *Id.* The police did not inform the magistrate judge of the second dog's failure to show even interest, and they searched the package anyway. *Id.* The Eighth Circuit first held that the police violated *Franks* by omitting from the warrant affidavit the fact that the first dog failed to give a full alert. *Id.* at 1234-35. Then, in response to the government's argument that the evidence should not be suppressed under *United States v. Leon*, 468 U.S. 897

(1984) (establishing exception for good-faith reliance on a search warrant), the court held that the police officers failed to act reasonably when they executed the warrant. 986 F.2d at 1235. "At the time the warrant was executed," the officers knew both that the first dog had failed to alert to the package and that the second dog failed to show any interest at all, and "this further information should have alerted the officers that they lacked probable cause to examine the package." *Id.* In this context, the court explained: "[W]e think the officers had a duty to provide the magistrate judge with any information which would undercut the warrant's validity. . . . We feel confident that if the magistrate judge had been aware of the full scope of the investigation, the application for a warrant would not have been granted." *Id.*

In *Bowling*, it was undisputed that Forest Service officers initially had probable cause to believe that the defendants owned illegal marijuana plots located on federal property and that evidence of that ownership was in the defendants' trailer. 900 F.2d at 928. After one officer left to apply for a search warrant, two other officers conducted a consent search of the trailer but failed to discover any incriminating evidence. *Id.* at 928-29. When the first officer returned with a search warrant, all three officers searched the trailer again—and this time, they found evidence linking the defendants to the marijuana operation. *Id.* at 929. The defendants argued that the unsuccessful consent search had dissipated the probable cause underlying the search warrant before the police began executing it, and therefore, the second search was unlawful. *Id.* at 930-31. The Sixth Circuit explained that "an initial fruitless consent search [may] dissipate[] the probable cause that justified a warrant," and that "the officers should have refrained from the second search until a neutral magistrate determined that probable

cause continued to exist." *Id.* at 932-33. But "[n]otwithstanding the officers' failure to do this," the court concluded that "the fruits of the second search" should not be suppressed because, "even if a neutral magistrate were apprised of the prior fruitless consent search, probable cause for a second search would still have existed." *Id.* at 933-34.[3]

In *Marin-Buitrago,* a magistrate issued a warrant to search an apartment for evidence of drug trafficking. 734 F.2d at 891. When the police applied for the warrant, they believed that one of the apartment residents, Marin-Buitrago, was a convicted drug trafficker named "Correa," and the warrant's probable cause determination was based in part on the police's observations of Marin-Buitrago and Correa's criminal history. *Id.* There was no dispute that the

---

[3] The majority argues that, in *Bowling*, "the searching officers discover[ed] new facts after beginning a search," and "the court analyzed at length whether probable cause had dissipated" during the search. Maj. at 29. That is an inaccurate description of *Bowling*'s facts. As noted above, some officers completed an unsuccessful *consent* search *while* other officers were obtaining a search warrant. 900 F.2d at 928-29. The unsuccessful consent search was new information that undermined the probable cause for the warrant, and the police learned that information *before* they began executing the search warrant. *Id.* at 933. The Sixth Circuit held that the police should have reported the unsuccessful consent search to the magistrate before executing the search warrant. *Id.* Even though the officers who obtained the warrant were not personally aware of the unsuccessful consent search before they started executing the warrant, the Sixth Circuit "imputed [the knowledge of the prior consent search] to all officers involved" because at least some officers were aware of the exculpatory information before they started executing the warrant, and any "lag time between the commencement of the second search and" the moment when the remaining officers learned about the unsuccessful consent search "was very brief." *Id.* In other words, the Sixth Circuit held that all the officers had actual or imputed knowledge of the new information that undermined probable cause *before* they began executing the warrant.

search warrant was valid when issued. *Id.* at 892. After the warrant was issued but before the police began executing it, officers conducted a traffic stop during which Marin-Buitrago provided valid identification indicating that he was Marin-Buitrago, not Correa. *Id.* The police did not report this new information to the magistrate, they executed the search warrant, and they found evidence of drug trafficking. *Id.* at 893.

Marin-Buitrago moved to suppress the evidence, arguing that the police violated the duty "to report any material changes in the facts contained in a warrant affidavit that occur before the warrant is executed." *Id.* The Second Circuit agreed that such a duty exists but explained that "[t]he duty to report new or correcting information to the magistrate does not arise unless the information is material to the magistrate's determination of probable cause." *Id.* at 893-94. Further, to make that determination, the court explained it needed to consider the new information about Marin-Buitrago's identity and the information in the affidavit "as a whole," and assess whether there was "a fair probability" that evidence of narcotics trafficking or Correa's presence would be found in the apartment. *Id.* at 895. Applying that standard, the Second Circuit concluded that the information about Marin-Buitrago's identity was *not* a "definite and material change[] . . . in the facts underlying the magistrate's determination of probable cause," and therefore, the police did not violate their duty to report new information to the magistrate. *Id.*

5. None of the cases in the four categories discussed above address what police should do when they learn information that undermines probable cause *while* executing a search warrant. The only circuit case involving that scenario is *Harte v. Board of Commissioners*, 864 F.3d 1154,

1182-87 (10th Cir. 2017). The majority asserts that *Harte* supports their conclusion that the police here violated the Fourth Amendment by continuing to execute the search warrant after finding one of the multiple videos they expected to find—and that the evidence they discovered while completing the authorized search must be suppressed. Maj. at 29-30. However, careful examination of *Harte's* facts and the Tenth Circuit's reasoning makes clear that *Harte* supports my conclusion that the police did not violate the Fourth Amendment by continuing to search for the other videos.

*Harte* was a Section 1983 case in which homeowners and their minor children claimed, in relevant part, that "deputies violated the Fourth Amendment by unreasonably prolonging the search [of their home] beyond the terms of the warrant." 864 F.3d at 1182. The district court granted summary judgment to the defendants on this and other issues. *Id.* at 1158. Each judge on the *Harte* panel wrote separate opinions; it is Judge Phillips' opinion that is relevant here. *See id.* at 1168-98.[4]

As Judge Phillips explained, county sheriff deputies suspected that the Hartes had a "marijuana grow operation"; the deputies obtained a warrant authorizing a search of the Hartes' home and the seizure of "marijuana in all forms," drug paraphernalia used to "cultivate and/or process marijuana," and "drug paraphernalia used to introduce drugs into the body." *Id.* at 1184. The deputies first searched the Hartes' basement where they expected to find marijuana

---

[4] Judge Lucero concluded there was no probable cause to search the Hartes' home at any point, but that—assuming the search warrant was initially supported by probable cause—he agreed with the relevant part of Judge Phillips' analysis. *Id.* at 1164 n. 5.

plants and instead found a hydroponic garden containing "tomato plants and other vegetables, in various stages of growth." *Id.* at 1183. The deputies field-tested the plants, and they "tested negative for marijuana." *Id.* Further, "[t]he deputies saw no indicia of a marijuana grow operation, such as blacked-out windows, fans, ventilators, drying racks, or scales." *Id.* Although the discovery of the tomato garden (and the absence of other indicia of a grow operation) significantly undermined probable cause to search for a marijuana-grow operation, the deputies "continue[d] searching the basement for any remnants of an earlier marijuana-grow operation—e.g., stray leaves or stems, or harvested marijuana being processed." *Id.* The deputies searched the basement for about 15 or 20 minutes, but "found no leaves, stems, or other remnants of a grow operation." *Id.* at 1183. Then, "lacking any evidence independent of a marijuana-grow operation that the Hartes were marijuana users, the deputies began searching [the entire house] for evidence of personal marijuana use." *Id.* at 1184. The deputies conducted this housewide search for evidence of personal use for over two hours, detaining the Hartes and their two minor children the entire time. *Id.* The deputies did not return to the state judge who issued the warrant before switching from searching the basement for evidence of a grow operation to searching the entire house for evidence of personal marijuana use. *Id.*

It is this secondary, extended search for evidence of personal use of marijuana that the Tenth Circuit held violated the Fourth Amendment. *Id.* As Judge Phillips explained, "the tenuous probable cause that the Hartes might have used marijuana depended on their growing marijuana. Thus, when the probable cause for growing marijuana dissipated, the already-weak probable cause of personal use

also dissipated. By ignoring everything they learned and *rummaging for any marijuana*, the Deputies ran afoul of the Fourth Amendment." *Id.* (emphasis added).

Notably, the Hartes argued that "the deputies should have stopped 'hunting for evidence of a *remnant* of a grow operation'" after discovering the tomato garden. *Id.* at 1182. But the court did not hold that the deputies violated the Fourth Amendment when they searched for remnants of a grow operation *after* discovering the garden—even though the court agreed that the discovery of the garden "dispelled any notion that the Hartes were steadily harvesting and growing marijuana." *Id.* at 1184. Nor did the court hold that the police had a duty to report the discovery of the tomato garden to the state judge who issued the warrant and get the judge's authorization to search for remnants. Rather, the court "accept[ed] that marijuana remnants would be probative of a past grow operation" and concluded only that the police acted unreasonably when they switched to searching for evidence of personal use. *Id.* at 1183-84. Indeed, the court concluded that the secondary search for personal use was unreasonable in part *because* "[t]he deputies *searched thoroughly* under the search warrant for any sign or remnant of a grow operation and found nothing." *Id.* at 1186 (emphasis added).

The deputies tried to defend the housewide search for personal use by "point[ing] to the search warrant's language authorizing seizure of '[m]arijuana in all forms'" and drug paraphernalia "used to introduce drugs into the body." *Id.* at 1184. It is in the context of rejecting that argument that Judge Phillips discussed the duty-to-report line of cases and stated, "[t]he deputies were not free to ignore facts that dissipated probable cause." *Id.* at 1185-86.

In concluding that the secondary search for personal use was unreasonable despite the warrant, Judge Phillips also relied on *United States v. Keszthelyi*, 308 F.3d 557 (6th Cir. 2002). *Harte*, 864 F.3d at 1186. In *Keszthelyi*, officers obtained a warrant to search the defendant's house based on an undercover investigation into a series of cocaine sales. *Id.* (describing *Keszthelyi*, 308 F.3d at 562). Officers searched the defendant's house for about two hours; they found "various incriminating items," including drug paraphernalia, cash, and firearms, but no cocaine. *Id.* (describing *Keszthelyi*, 308 F.3d at 563). The next day, the officers went back to the house and searched it again without obtaining a new search warrant. *Id.* The Sixth Circuit held that the second search was unreasonable because "a search warrant authorizes only one search," and "'a warrant expires once it has been fully executed.'" *Id.* (describing *Keszthelyi*, 308 F.3d at 568-70, and quoting *Keszthelyi*, 308 F.3d at 570). Judge Phillips viewed the secondary search for personal use as analogous to the second search in *Keszthelyi*, and explained that the secondary search was unauthorized because the deputies had fully executed the warrant to search for evidence of a grow operation: "Having concluded that the Hartes hadn't been growing marijuana, probable cause dissipated, and further searching became unreasonable under the Fourth Amendment. The '*warrant had been fully executed*,' [*United States v. Gagnon*, 635 F.2d 766, 769 (10th Cir. 1980),] and [the] deputies no longer 'possessed a reasonable basis for believing that undiscovered evidence' that the warrant authorized them to seize was in the Hartes'

house, *Keszthelyi*, 308 F.3d at 572." *Harte*, 864 F.3d at 1187 (emphasis added).[5]

The deputies' discovery of the Hartes' tomato garden undermined probable cause for a marijuana grow operation at least as much as the video of Holcomb and JJ undermined probable cause for rape. Yet the Tenth Circuit rejected the Hartes' argument that the deputies violated the Fourth Amendment by searching for remnants of a grow operation after finding the tomato garden. Instead, the court held only that the secondary search for evidence of personal use was unreasonable. The search for the remaining videos in this case is analogous to the search of the basement for remnants of a grow operation in *Harte*—not to the secondary housewide search for evidence of personal use. When the police were searching for the remaining videos, they were completing the search authorized by the warrant, not starting a secondary search for evidence of a different crime after fully executing the warrant. And just as it was reasonable for the deputies in *Harte* to fully execute the warrant by

---

[5] Judge Phillips concluded that "[e]ven though the deputies violated the Hartes' Fourth Amendment rights," the deputies were entitled to qualified immunity because it was not "clearly established" at the time that their search for personal marijuana use was unreasonable under the circumstances. *Id.* at 1188-90. He explained that "*Bowling*, *Keszthelyi*, and *Cassady*" lent "some support for the Hartes' claim," but were not factually similar enough to put the constitutional question beyond debate. *Id.* at 1189. "After the deputies realized that the Hartes hadn't committed the crime described in the search-warrant affidavit—growing, harvesting, and processing marijuana—. . . [they] continued searching for evidence of a separate crime for which they did not have probable cause—personal use of marijuana. But I still can't say that every law-enforcement officer would have known that searching for evidence of personal marijuana use or possession was unreasonable when probable cause to search for a marijuana-grow operation had initially existed but dissipated during the search." *Id.* (citation omitted).

searching for remnants, it was reasonable for the police here to fully execute the warrant by searching for the remaining videos.

II. Faithfully Applying the Line of Cases on Which the Majority Relies, the Police Did Not Violate the Fourth Amendment by Continuing Their Search.

As discussed above, in *United States v. Dalton*, 918 F.3d 1117 (10th Cir. 2019); *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993); *United States v. Bowling*, 900 F.2d 926 (6th Cir. 1990); and *United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984), our sister circuits have held that, under certain conditions, police have a duty to report new information to the magistrate before executing a search warrant. When considering a motion to suppress evidence based on an alleged violation of that duty, the court first asks whether the new information gave rise to a duty to report. *See, e.g.*, *Bowling,* 900 F.2d at 933. If the court concludes that police should have reported the information, then the court asks whether the information completely dissipated probable cause. *See id.* If probable cause did not completely dissipate, then the court will not suppress evidence as a remedy for the violation. *See id.*; *Jacobs*, 986 F.2d at 1233; *Marin-Buitrago*, 734 F.2d at 895-96.

Under this line of cases, the duty to report does not arise unless three conditions are met. The first condition: The police must discover the information *before* they begin executing the search warrant. *Marin-Buitrago,* 734 F.2d at 893 (Police are required "to report any material changes in the facts contained in a warrant affidavit that occur *before the warrant is executed*.") (emphasis added); *Dalton*, 918 F.3d at 1128 (duty to report may arise when police discover "new information . . . *before the warrant is executed*")

(emphasis added); *Bowling*, 900 F.2d at 933 (before beginning to execute warrant authorizing search of trailer, police should have informed the magistrate judge of their "prior fruitless consent search" of the trailer); *Jacobs*, 986 F.2d at 1235 (before "the officers executed the warrant . . . the officers had a duty to provide the magistrate judge with any information which would undercut the warrant's validity").

The second condition: The new information must constitute a "definite and material change . . . in the facts" contained in a warrant affidavit. *Marin-Buitrago*, 734 F.2d at 893-94. *See also Dalton*, 918 F.3d at 1128 (asking "whether a material fact in [the] warrant affidavit was determined by the executing officers to have been either inaccurate or omitted prior to the time the warrant was executed"); *Jacobs*, 986 F.2d at 1233 (considering whether "the officers' failure to notify . . . the magistrate judge of the results of the second canine sniff rendered the search warrant affidavit misleading").

The third condition: The change must affect the basis of the magistrate judge's probable cause determination. *See Bowling*, 900 F.2d at 933 (a duty to report new information to the magistrate judge arises only when police "are alerted to circumstances which affect the probable cause for [the search warrant's] execution"); *Marin-Buitrago*, 734 F.2d at 895 (police need only report newly discovered facts that "cast doubt on the existence of probable cause"); *Dalton*, 918 F.3d at 1128 (courts must ask whether the "new information received by police nullifies information critical to the earlier probable cause determination"); *Jacobs*, 986 F.2d at 1235 ("[T]he officers had a duty to report any information which would undercut the warrant's validity.").

Applying these conditions here, the police had no duty to stop their search of Holcomb's computer and report the discovery of the video to the magistrate.

The first condition plainly is not met here. The police discovered the video in the course of executing the valid warrant authorizing their search of Holcomb's computers, not before they began executing it.

The majority contends that the timing should not matter. But recall that under this line of cases, the police have a duty to report information that undermines probable cause—even if it does not completely dissipate probable cause. *See supra* at 59. For example, merely conducting a brief search without finding inculpatory evidence undermines probable cause enough to trigger the duty to report back to the magistrate. *See, e.g., Bowling*, 900 F.2d at 933 (conducting a "preliminary" and "very quick" but fruitless consent search undermined probable cause enough to trigger the duty to report). If, as the majority seems to hold, the standard set in *Bowling* applies equally to the execution of a warrant, then whenever the police search for some time without finding anything, they are required to stop searching, report to the magistrate that their initial search was fruitless, and ask the magistrate whether probable cause still exists. Given the variety of circumstances under which the duty to report may arise, imposing this duty on police when they are executing a warrant seems unduly onerous.

But even assuming that we should erase the first condition and require the police to report new information discovered while executing a warrant, I would still find no duty to report here because the discovery of the first video did not definitely and materially change the facts specified in the warrant affidavit.

The affidavit disclosed both JJ's allegation that Holcomb raped her and Holcomb's claim that all their sexual interactions had been consensual.  The affidavit also reported all the following information:  JJ said that she and Holcomb had consensual sex multiple times in the same location at which she alleged the rape occurred—Holcomb's bedroom, where the video cameras were set up.  Holcomb's wife said she had watched a video in which JJ appeared to be "pushing to have sex with [Holcomb]" and having consensual sex.  "Holcomb encouraged detectives to watch the video surveillance and even provided Detectives with the passcode for his desktop computer."  "Holcomb further told Detectives that his laptop may contain evidence in this case as well."  Holcomb provided written permission to search his desktop, laptop, and cell phone, but he revoked his consent before the police had a chance to complete the search.

The affidavit also explicitly informed the magistrate that the computers and phone "may contain exculpatory evidence," and that "[t]his evidence, when considered in combination with the other known facts . . . [could] be used to corroborate *or refute* the details of . . . the statements of a victim."[6]

---

[6] The majority mischaracterizes my reasoning when it asserts that, under my approach, courts would ask only "whether the affidavit supporting the search warrant blandly stated that the search may uncover exculpatory evidence as well as inculpatory evidence."  Maj. at 33.  As explained above, the affidavit here did not only state generally that the search may uncover exculpatory evidence—it also specifically described Holcomb's wife's statement that she watched one of the videos and believed the sex was consensual, as well as Holcomb's statement that he believed the videos would refute JJ's allegations.  Further, I conclude that the police acted reasonably in continuing to search after finding the

Based on this affidavit—which expressly informed the magistrate that the computers and phone could contain videos that contradicted JJ's allegations—the magistrate issued a search warrant permitting the search and collection of all "[s]urveillance video or images depicting JJ or John Holcomb and any other surveillance video or images from Jan 26th 2020 to current." The police began to execute that valid search warrant and found *one* of the videos that the affidavit anticipated they would find. Considering that the affidavit already informed the magistrate that there could be videos that appeared to contradict JJ's account, the "new" information—that there was a video that appeared to contradict JJ's account—did not definitely and materially change the facts specified in the affidavit. Even though the video appeared to contradict some of JJ's allegations, the *affidavit* remained accurate.

The third condition: I agree with the majority that the discovery of the video affected the basis of the magistrate judge's probable cause determination. The magistrate judge based her probable cause determination on the search warrant affidavit's disclosure of JJ's detailed description of the incident in which Holcomb allegedly raped her. The video of the interaction therefore related directly to JJ's allegations about the incident and to the basis of the magistrate's probable cause determination. But I would not hold that police have a duty to report new information to the magistrate when this is the only condition met. In my view, the duty to report arises only when all three conditions are

---

first video by considering the *totality* of the circumstances, not merely the "bland" statement regarding exculpatory evidence. *See supra* at 38-40; *infra* at 52-58, 60-63.

met. And, even if we are going to get rid of the first condition, we should at least keep the second.

III. Even if the Police Violated a Duty to Report to the Magistrate, Suppression is Unwarranted Because Probable Cause Did Not Completely Dissipate.

Even assuming the police should have stopped executing the warrant and reported the first video to the magistrate, suppression is unwarranted because probable cause did not completely dissipate. To assess the effect of the video on probable cause, we must step into the shoes of a magistrate. *Marin-Buitrago*, 734 F.2d at 895. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates,* 462 U.S. 462 U.S. 213, 238 (1983)). Thus, our task here is to determine whether, after the police discovered the first video, there remained a fair probability that evidence of the alleged sexual assault would be found on Holcomb's computers. When making that determination, the video "and the information in the affidavit must be considered as a whole." *Id.* at 895-96. Considering the video together with the information the police provided in the affidavit, such a fair probability remained.

Notably, the majority finds that the video completely dissipated probable cause even though the video is not in the record. The majority relies solely on Detective Kuschnereit's police report describing video "clips" he was shown by Detective Neufeld, who was performing the forensic search of Holcomb's computers and phone.

Assuming Detective Kuschnereit's police report's brief description of the video clips is completely accurate, I agree that the video was exculpatory. However, the video did not contradict *all* of JJ's allegations that could support probable cause for second-degree rape. For example, JJ alleged that Holcomb inserted his finger into her anus without her consent, causing her significant pain, and the police report states that a clip shows Holcomb "reaching over to touch [JJ's] butt." Any penetration of an anus, "however slight," by forcible compulsion constitutes second-degree rape under Washington law. *See* Wash. Rev. Stat. 9A.44.050 ("A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person [] by forcible compulsion."), 9A.44.010(14) ("'Sexual intercourse' (a) has its ordinary meaning and occurs upon any penetration, however slight, and (b) Also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another . . . .").

The majority asserts that the video completely dissipated probable cause for second-degree rape because that crime requires "forcible compulsion"—and, according to the police report's description, Holcomb did not appear to use physical force against JJ. Maj. at 22. However, all we know is that a police officer who viewed "clips" of the first video reported that "JJ d[id] appear to be willingly performing oral sex on Holcomb," but that another officer and the prosecutor who viewed the video still thought it worthwhile to look for additional videos of the interaction from other angles. The police report therefore does not conclusively show that Holcomb did not use physical force against JJ.

I also agree with the Government that there was probable cause to continue searching for other videos "that might

show a different part of the encounter or different angles that confirmed J.J.'s account." As noted, Holcomb told the police that there could be multiple videos from different angles. After viewing the first set of video clips, the prosecutor agreed that the clips did not show Holcomb restraining JJ or physically forcing her to perform oral sex, but he also advised the police "to continue processing the other hard drives as per standard procedures and to continue looking for additional surveillance videos or angles that may be present."

The majority concludes there was no reason to search for other videos because the brief description of the video means it was highly unlikely that another video would show Holcomb pushing JJ's head down, as she alleged.[7] Maj. at 26. But, as the government points out, JJ could have been mistaken or confused about the exact timing and order of events; in that case, another video or segments of the first video not included in the "clips" described in the police report could show a different, non-consensual encounter. A video of the same encounter from a different angle could corroborate JJ's other allegations, such as her allegation that she told repeatedly told Holcomb "no" or that "she needed to stop," or that Holcomb penetrated her anus without her consent. Or different videos could show that Holcomb had doctored the first video.

---

[7] Even assuming it was "highly unlikely" that the police would find an inculpatory video, *Harte* supports my conclusion that the police reasonably continued searching for the remaining videos. The probability that the police would find inculpatory videos was comparable to the probability in *Harte* that deputies would find remnants of a marijuana grow operation after finding the tomato garden. *See Harte*, 864 F.3d at 1183-84.

In my view, the police had probable cause to believe that Holcomb had the means, motive, and opportunity to doctor the video, considering the facts disclosed in the affidavit: Holcomb had a complex video surveillance system, which indicates that he was technologically sophisticated and thus capable of doctoring the video. Holcomb likely had access to video of him and JJ having consensual sex in his bedroom where the rape allegedly occurred, because JJ told the police she and Holcomb had consensual sex multiple times in the same bedroom before the alleged rape. During an authorized search of Holcomb's home (before the police seized his computers), the police saw an electronic chat in plain view on his computer monitor, in which Holcomb told his wife that JJ had accused him of being a rapist; his wife said she would come home; and Holcomb told her she didn't need to because he "handled this shit." Holcomb had "been convicted of several serious Domestic Violence charges including Burglary 2nd, Harassment, Interfering with reporting of Domestic Violence and Violation of Court Order," and had "previous arrests for Assault 2nd Domestic Violence." And Holcomb had the opportunity to edit the video because he found out JJ had accused him of rape at approximately 12:30 a.m., and the police did not seize his devices until about 18 hours later.

The majority asserts there was not a "substantial chance that Holcomb had doctored the video in a way that [removed] the alleged criminal conduct" because "the detectives reported no glitches or oddities in the video that might suggest tampering" and "[n]othing in the reports stated or implied that they thought Holcomb could have altered the video that they watched." Maj. at 26. But because we are assessing probable cause to continue searching—not Holcomb's guilt—the question is not

whether Holcomb *actually* doctored the video, but whether, when the police first viewed the video, it was reasonable under the circumstances to believe Holcomb may have done so.

Even if the relevant question were whether Holcomb doctored the video, we cannot conclude on this record that he did not. The fact that Detective Kuschenreit's reports do not mention glitches or oddities does not conclusively show that the video did not contain them. Neither Kuschenreit's reports nor any other record evidence affirmatively states that the video was free of glitches or oddities. And the majority has not seen the video; its impression of the video is based entirely on Kuschenreit's brief description of some video "clips." Indeed, given that his reports describe only video clips, it is possible that there was no continuous video depicting the entire encounter—only a series of clips that appeared to show one encounter.[8] Even assuming there was

---

[8] Detective Kuschnereit's police report states that Detective Neufeld showed him and the prosecutor "a few" of "several videos" he found, describes those videos as "clips," and indicates that each clip portrays a different part of a sexual encounter between Holcomb and JJ. The majority objects to my description of the videos at issue as "clips," asserting that Detective Kuschnereit's first police report (in which he summarized what Detective Neufeld described to him by phone) establishes that there is one continuous video with no glitches or oddities. Maj. at 26 n.6. In my view, however, Detective Kuschnereit's second police report (describing what he saw firsthand) suggests that there was no continuous surveillance video of the entire encounter—only a series of video clips that, when viewed together, appeared to show one encounter. At best, viewed together, Detective Kuschnereit's reports are ambiguous about the nature and quality of the videos. Given the reports' brevity and ambiguity, the majority's certainty about the nature, quality, and content of the videos is unfounded. Although I question whether one continuous video even exists, for ease, I generally refer to "the video" in this dissent.

one continuous video capturing the entire encounter and that the video did not contain glitches or oddities, I do not think we can know, from this record, whether Holcomb could have edited the video to remove footage of him physically forcing JJ without leaving signs of doctoring.

Even assuming the video decisively showed that Holcomb did not use physical force against JJ, its discovery did not completely dissipate probable cause. The search warrant authorized a search only for evidence of rape in the second degree, which requires "forcible compulsion." But, under Washington law, a criminal charge automatically includes inferior-degree offenses. A jury may find a defendant not guilty of the charged offense but guilty of an inferior-degree offense, Wash. Rev. Stat. 10.61.003, and a prosecutor need not amend an indictment—even mid-trial— if the evidence supports a conviction for an inferior-degree offense but not the original charge, *State v. Peterson*, 948 P.2d 381, 386 (Wash. 1997) (en banc). And third-degree rape—that is, nonconsensual sexual intercourse *without* forcible compulsion—is an inferior-degree offense of second-degree rape. *See* Wash. Rev. Stat. 9A.44.060, 9A.44.050. Here, the magistrate judge found that there was probable cause to search for evidence of second-degree (forcible) rape—which, in turn, included the inferior-degree offense of third-degree (non-forcible) rape. And the record does not decisively show that JJ consented to the sexual encounter. As explained, the video is not in the record, and the police reports do not indicate whether the video contained good-quality audio. We therefore do not know whether Holcomb threatened JJ or whether JJ said "no" but Holcomb ignored her. Therefore, even if the discovery of the first video was conclusive evidence that Holcomb did not use physical force against JJ—so did not commit second-

degree rape—the video did not completely dissipate probable cause to search for evidence of the inferior-degree offense of third-degree rape contained within the same charge.

The majority contends that *Harte* supports their view, but again, I disagree. As discussed above, Judge Phillips' controlling opinion stated that the discovery of the tomato garden "dispelled any notion that the Hartes were steadily harvesting and growing marijuana," *Harte*, 864 F.3d at 1184, yet he rejected the argument that deputies acted unreasonably by continuing to search for remnants of a marijuana grow operation. *See supra* at 55. So either Judge Phillips concluded that the discovery of the tomato garden undermined but did not *completely* dissipate probable cause, or he concluded that it was reasonable to search for remnants even though probable cause completely dissipated. Either way, Judge Phillips' conclusion that the police reasonably searched for remnants even after finding the tomato garden supports my conclusion that the police acted reasonably by continuing to search for the remaining videos.

The majority sets up a straw man by asserting that, under my approach, officers searching for missing jewels could continue searching even after receiving a mid-search call informing them that the jewels had been found. Maj. at 31. I agree that, under the totality of the circumstances presented in the majority's hypothetical, continuing to search for found jewels is unreasonable. But this case presents materially different circumstances. Maybe if, in the middle of the search, JJ had confessed to the police that she lied about Holcomb forcing her to have sex without her consent, the majority's lost-jewelry hypothetical would be apt. But the discovery of the video here is not nearly as conclusive as the

discovery of the missing jewels in the majority's hypothetical.

   IV.  <u>Because the Majority Concludes that the Police Unreasonably Executed the Warrant, They Err in Considering the Applicability of the Good Faith Exception for Reasonable Reliance on a Later-Invalidated Warrant.</u>

As explained, I disagree with the majority's conclusion that the police executed the search warrant unreasonably. But if I agreed with the majority on that point, I would also agree with Holcomb that, when the police execute a warrant unreasonably, the good faith exception for reliance on a later-invalidated warrant is inapplicable.

The good faith exception excuses unlawful searches that are the "result of nonculpable, innocent police conduct." *Davis v. United States*, 564 U.S. 229, 240 (2011). Accordingly, we do not suppress evidence when "officers reasonably rely on the issuance of a warrant that is later held invalid," or "when officers rely on law that was binding at the time of their challenged conduct but later overturned." *United States v. Holmes*, 121 F.4th 727, 734 (9th Cir. 2024) (citations omitted). Here, the government relies only on the good faith exception for reliance on a warrant; it does not contend that the officers relied on law that was binding but later overturned.

The good faith exception for reliance on a warrant "is not relevant where the violation lies in the execution of the warrant, not the validity of the warrant." *United States v. Gantt*, 194 F.3d 987, 1006 (9th Cir.1999), *rev'd on other grounds, United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). This is because "the good-faith exception is inapplicable" where "the violation is the fault of the officers"

rather than the judiciary.  *Id.*  Here, the alleged "violation lies in the execution of the warrant" because it is undisputed that the search warrant affidavit provided a sufficient basis for probable cause when the magistrate judge issued the warrant and when the police began executing it.  The only question is whether the police erred when they continued to execute the warrant after discovering the first video of the incident with JJ.  Therefore, assuming a Fourth Amendment violation occurred, the good faith exception for reasonable reliance on a warrant would not apply.[9]

## V.  Remand is Necessary to Determine Whether the Dominion and Control Provision Justifies Suppression.

The majority holds that the search warrant's dominion and control provision was overbroad and insufficiently particular because, unlike the other, valid provisions of the warrant, it did not contain temporal limitations or limits on the types of files subject to the search.  However, the majority does not decide whether this deficiency justifies suppression.  Maj. at 14-18.

The government argues that, even if the dominion and control provision was insufficiently specific, suppression is unwarranted for three reasons:  First, the police found the child pornography evidence while executing the valid provisions of the warrant.  Second, the child pornography videos were in plain view when the police were executing the valid provisions of the warrant.  Third, the good faith

---

[9] Our sister circuits have not addressed whether the good faith exception for reasonable reliance on a warrant applies when police officers violate their duty to report evidence they discover during the execution of a warrant to the magistrate judge.  This is likely because no circuit court has imposed such a duty in these circumstances.

exception applies because the police conducted the search in objectively reasonable reliance on the lawful provisions of the warrant.

In my view, the merits of the government's arguments depend on facts that should be determined after an evidentiary hearing, including the standard procedures used by law enforcement to conduct digital forensic searches as of February 2020; the actual protocol, if any, employed during the search; the extent to which the video thumbnails resembled the surveillance footage of JJ; and whether the file dates and metadata were readily ascertainable by law enforcement. *See United States v. Hurd*, 499 F.3d 963, 966 (9th Cir. 2007) ("Whether a search exceeds the scope of a search warrant is an issue we determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search.") (citation modified). Even assuming the child pornography's metadata indicated that it was outside the scope of the authorized search, we have held, in the context of a computer search, that "[t]he government should not be required to trust the suspect's self-labeling when executing a warrant." *United States v. Adjani*, 452 F.3d 1140, 1150 (9th Cir. 2006).

Because the record is not clear enough for us to make the necessary findings of fact in the first instance, I would remand to the district court to determine whether the police permissibly found the child pornography evidence while searching under a lawful provision in the warrant. *See United States v. Clark*, 31 F.3d 831, 836 (9th Cir. 1994) ("We remand to the district court the limited question of what evidence was obtained under the overbroad portion of the warrant and direct the suppression of that evidence.").

Without a remand, we would need to decide whether the exception for good faith reliance on a warrant applies on the existing record. Under that exception, suppression is unwarranted if the police acted in "objectively reasonable reliance" on the invalid warrant. *Leon*, 468 U.S. at 918 n. 19. As the district court recognized, however, there is an intra-circuit split regarding the standard for determining whether reliance is "objectively reasonable." *United States v. Holcomb*, 639 F. Supp. 3d 1142, 1146 (W.D. Wash. 2022).

The split reflects different readings of *Messerschmidt v. Millender*, 565 U.S. 535 (2012). *Messerschmidt* concerned a plaintiff's claim that two police officers violated his Fourth Amendment rights by executing an invalid search warrant. *See id.* at 544. The defendants asserted a qualified immunity defense, and the plaintiff argued that they were not entitled to qualified immunity because the warrant was invalid and no reasonable officer could have believed otherwise. *Id.* at 548. The Supreme Court held that the defendants were entitled to qualified immunity because, "[e]ven if the warrant . . . were invalid, it was not so obviously lacking in probable cause that the officers [could] be considered plainly incompetent for concluding otherwise." *Id.* at 556. In this context, the Court stated in a footnote: "Although *Leon* involved the proper application of the exclusionary rule to remedy a Fourth Amendment violation, we have held that 'the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer' who obtained or relied on an allegedly invalid warrant." *Id.* at 546 n.1 (quoting *Malley v. Briggs*, 475 U.S. 335, 344 (1986), and citing *Groh v. Ramirez*, 540 U.S. 551, 565 n. 8 (2004)).

In *United States v. Needham,* 718 F.3d 1190 (9th Cir. 2013), we affirmed the district court's denial of the

defendant's motion to suppress on the ground that the police relied in good faith on the later-invalidated warrant. In discussing the good faith exception, we quoted the *Messerschmidt* footnote and stated that "the standard for granting qualified immunity is the same as the standard for objective reasonableness under *Leon*." *Id.* at 1195. And, because we had recently held that officers were entitled to qualified immunity in a case strongly resembling *Needham*, we concluded that reliance on the warrant in *Needham* "must also have been objectively reasonable under the *Leon* doctrine." *Id.* at 1194-95.

However, in *Manriquez v. Ensley*, 46 F.4th 1124 (9th Cir. 2022), we stated, "[w]hile there is admittedly substantial overlap between" the reasonableness analyses in the good-faith and qualified-immunity contexts, "the qualified immunity standard is more 'forgiving' than the requirements of the Fourth Amendment." *Id.* at 1130 n.1. We further stated, "a court may hold that an officer's search does not fall within the good-faith exception based on analogous case law or even directly relevant authority from a sister circuit. But there still might not be 'clearly established' case law in our circuit to withstand qualified immunity." *Id.* In *Manriquez,* a magistrate issued a warrant to search a suspect's motel room and later gave the police permission over the phone to amend the warrant to authorize a search of the suspect's home. *Id.* at 1127-28. However, the police searched the home without actually amending the warrant. *Id.* at 1128. We held that the good faith exception did not apply because any reasonable officer would have noticed that the warrant did not authorize a search of the house. *Id.* at 1130 & 1130 n.1. However, we also held that the officers were entitled to qualified immunity because the "novel

facts" of the case indicated that they did not violate a "clearly established" right. *Id.* at 1130-31.

If the good faith exception does not apply (and therefore, evidence should be suppressed) when a reasonably trained officer should have known that the warrant was invalid based on analogous case law (even if the officer would be entitled to qualified immunity because that case law did not "clearly establish" the warrant's invalidity), then this case presents a close question. On the one hand, we have long held, in various contexts, that a warrant must include guardrails that ensure that "[t]he scope of the warrant, and the search, is limited by the extent of probable cause." *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991). And we have remarked that there are "heightened specificity concerns in the computer context, given the vast amounts of data they can store." *Adjani*, 452 F.3d at 1149. On the other hand, in cases like *Adjani* and *Hill*, we have rejected overbreadth challenges to search warrants that authorized police to search entire electronic devices—without any date or other limits. *See id.* at 1147-50 (rejecting overbreadth challenge where warrant instructed police to "examine all of the data contained in the computer equipment and storage devices to view their precise contents"); *United States v. Hill,* 459 F.3d 966, 973-77 (9th Cir. 2006) (rejecting overbreadth challenge where warrant authorized police to search the defendant's "personal computer" and "[a]ll storage media belonging to either [the computer] or the individual identifying himself as the defendant").[10]

---

[10] In the original, now-vacated opinion in this case, the majority concluded that the good faith exception did not apply under either

But if the good faith exception applies unless precedent clearly established that the warrant was invalid when the police relied on it, then I agree with the district court that the child pornography evidence should not be suppressed because there is no "binding precedent considering the precise question now before the Court: whether a non-temporally limited dominion and control clause renders an otherwise properly limited warrant authorizing search and seizure of digital evidence unconstitutionally general." *Holcomb*, 639 F. Supp. 3d at 1148-49.

If the intra-circuit conflict between *Needham* and *Manriquez* is dispositive in this case, we should hear it en banc to resolve it.

For all of the foregoing reasons, I respectfully dissent.

---

standard. *Holcomb*, 132 F.4th at 133. But the majority now acknowledges there is a strong argument that our prior, "potentially analogous cases, such as *Adjani*, 452 F.3d 1140 [and *Hill*] may have led the officers to believe that" the "broad search" authorized by the dominion and control provision "was lawful." Maj. at 19.